Arthur D. Grossman (ADG 9237)
Robert J. Rohrberger (RJR 1918)
David A. Ward (DW 7669)
FOX AND FOX LLP
70 South Orange Avenue
Livingston, New Jersey 07039
973-597-0777
Attorneys for Plaintiff

Of Counsel:
Sibley P. Reppert
LAHIVE & COCKFIELD, LLP
28 State Street
Boston, MA  02109 - 1784
Tel: (617) 227-7400
Fax: (617) 742-4214

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ETONIC WORLDWIDE, LLC,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>KINETIC SPORTS, INC., and IN STRIDE SHOES, LLC,<br><br>　　　　　　Defendants. | Civil Action No.<br><br>**COMPLAINT WITH DEMAND FOR TRIAL BY JURY** |

　　　1.　　This is an action for breach of contract, trademark infringement, unfair competition, and trademark dilution, in which plaintiff seeks preliminary and permanent injunctive relief as well as damages.

- 1 -

## PARTIES AND JURISDICTION

2.      Plaintiff, Etonic Worldwide, LLC ("Etonic"), is a Delaware limited liability corporation, having its principal place of business in Waltham, Massachusetts.

3.      Defendant, Kinetic Sports, Inc. ("Kinetic"), is a New Jersey corporation having its principal place of business in Hillsborough, New Jersey.  Daniel Werremeyer ("Werremeyer") is President of Kinetic.

4.      Defendant, In Stride Shoes LLC ("In Stride") is a Delaware limited liability company with its principal place of business at 29 Polhemus Drive, Hillsborough, New Jersey.

5.      This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1338(a), because this action arises under an Act of Congress relating to trademarks.

6.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332 in that this action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

7.      This Court has personal jurisdiction over the defendants in that they all reside in this District.

## FACTS

### A.      Etonic and the Etonic Trademarks

8.      Etonic is the exclusive owner of numerous federally registered United States trademarks, including the marks ETONIC (Registration Nos. 872,644, 1,057,749, 0766756), ETONIC and design (Registration Nos. 1,328,691 and 1,338,021), and DRX (Registration No. 2,770,386) (the "Etonic trademarks").

9.      Etonic sells high quality performance athletic shoes, golf shoes and bowling shoes under the Etonic trademarks.

- 2 -

10.     Etonic was founded in 1876 and, on information and belief, is the oldest company in the world making athletic shoes.

11.     Etonic has invested a great deal of time and money buying, building, and enhancing the image of the Etonic brand.

12.     Etonic's brand and trademarks are by far the most valuable assets possessed by Etonic.

13.     The Etonic trademarks are famous marks.

### B.     Etonic's License to Kinetic

14.     On or about January 1, 2000, Spaulding Sports Worldwide, Inc. ("Spaulding"), as Licensor, and Orion Sports and Leisure, Inc. ("Orion"), as Licensee, executed a License Agreement relating to the trademark "Etonic." Orion conveyed its rights under the License Agreement to Kinetic on or about June 22, 2000 (the "2000 License Agreement").

15.     On or about April 8, 2003, Spaulding and Etonic executed an agreement pursuant to which Spaulding assigned its rights under said License Agreement to Etonic.

16.     On or about May 28, 2004, Kinetic commenced a civil action against Etonic in the Superior Court of New Jersey that subsequently was removed to this Court by Etonic and became Civil Action No. 04-2564 (GEB) (the "2004 Action").

17.     In the 2004 Action, Kinetic sought a declaration of its rights under the 2000 License Agreement and moved for a temporary restraining order restraining Etonic from terminating said License Agreement.

18.     Following a hearing before this Court, and with the assistance of this Court, Etonic and Kinetic entered into a new License Agreement effective as of June 16, 2004 that superseded the 2000 License Agreement (the "2004 License Agreement"). A copy of the 2004 License Agreement is attached hereto as Exhibit 1.

19.     Pursuant to the 2004 License Agreement, Etonic granted to Kinetic the exclusive right and license to utilize the Etonic trademarks in connection with performance grade athletic shoes within a specified territory, subject to restrictions and conditions recited in the 2004 License Agreement.

20.     The 2004 License Agreement provided that its term would expire on December 31, 2005 with no rights of renewal.

21.     The 2004 License Agreement contained, as Exhibit G thereto, a statement of "Etonic product principles" intended to insure the high quality of the Etonic brand.

22.     Section 7.1 of the 2004 License Agreement provided that, "three (3) or more rectified defaults and/or breaches of the warranties of this Agreement by [Kinetic] during any twelve (12) month period shall be grounds for immediate termination of this Agreement by Etonic."

23.     Section 7.1 of the 2004 License Agreement also provided that, "upon termination of this Agreement, all rights of [Kinetic] to manufacture, sell and distribute Articles shall cease, and all royalties on shipments theretofore made shall become immediately due to Etonic, notwithstanding anything herein to the contrary."

24.     Section 8.13 of the 2004 License Agreement provided that Kinetic's "failure to utilize the Trademarks strictly in accordance with the terms of this Agreement, and to cease the manufacture, sale and distribution of Articles, advertising material or the Trademark at the termination or expiration of this Agreement . . . will result in immediate and irreparable damages to Etonic . . . ." Kinetic further acknowledged and admitted that "there is no adequate remedy at law for such failure or breach; and that in the event of such failure or breach, Etonic shall be entitled to seek equitable relief by way of temporary and permanent injunctions, and such other relief as any court with jurisdiction may deem just and proper."

- 4 -

25.     Under Section 8.10 of the 2004 License Agreement, "in the event Etonic brings an action to enforce any provision of this Agreement, [Kinetic] shall reimburse it for the cost and expense of such action, including Etonic's attorney's fees."

26.     Under Section 5.3 of the 2004 License Agreement, the parties agreed that "[Kinetic] will sell Etonic branded footwear and apparel only to such markets as will enhance the upscale image of the Trademark. [Kinetic] shall be in default if sales of the Articles are made to 'discounters,' as that term is commonly understood by parties as of the Effective Date."

27.     Under Section 6.1 of the 2004 License Agreement, Kinetic was obliged to submit to Etonic's representative "first run specimens of each article in a form satisfactory to Etonic, and a written request for approval, together with written specifications for each article in a form satisfactory to Etonic, and a written request for approval of the specimen and specifications."

28.     Under Section 6.3 of the 2004 License Agreement, Kinetic agreed that "it will not in any way register or use the Trademark or any similar name alone or in conjunction with any other words as a trade name or trademark, nor will the trademark be used by [Kinetic] in the name of any corporation, partnership or other business entity."

29.     Under Section 5.1 of the 2004 License Agreement, Kinetic agreed that any performance footwear products offered by Kintetic "shall not replicate patterns or molds for or are confusingly similar to any Articles [performance grade athletic shoes bearing or used in conjunction with the Etonic trademarks]." Kinetic further agreed "not to use the same or confusingly similar patterns or molds as those used for the Articles in any products it creates or sells under any other marks."

30.     Under Section 8.7 of the 2004 License Agreement, the parties agreed that, "neither party shall disparage the other party or its officers or products."

31.     Under Section 5.1 of the 2004 License Agreement, Kinetic agreed "to keep the terms of the settlement between Etonic and Kinetic and of the 2004 lawsuit confidential from customers and sales people until June 1, 2005."

32.     Under Section 6.3 of the 2004 License Agreement, Kinetic agreed that, "except as otherwise agreed in writing, in no event shall [Kinetic] deviate in any manner in its use of the Trademark from the form of the Trademark as set forth in [Exhibit A to the 2004 License Agreement]."

33.     Under Section 5.1 of the 2004 License Agreement, Kinetic agreed that, as of June 16, 2004, Etonic "may participate in sales calls with customers."

34.     Under Section 5.3 of the 2004 License Agreement, not later than ninety days prior to each annual anniversary of the effective date of said agreement, Kinetic agreed to provide Etonic with a written marketing plan and program for Kinetic's activities thereunder.

35.     Under Section 5.4 of the 2004 License Agreement, Kinetic agreed to use "best efforts to continually provide customer service on Etonic branded business at a high level of quality, commensurate with the excellence normally expected from a well known national brand company . . . ."

36.     Under Section 6.2 of the 2004 License Agreement, Kinetic agreed to "submit in writing to Etonic or its authorized representative for its approval all advertising and packaging and other material prepared by or for it during conceptual stages before the same is used, circulated or displayed . . . ."

37.     Under Section 6.0 of the 2004 License Agreement, Kinetic agreed "not to advertise, market, promote or sell the Articles through the Internet or the Worldwide Web without first obtaining the written approval of Etonic.

C.      **Kinetic's Creation of In Stride**

- 6 -

38.    Before signing the 2004 License Agreement, Daniel Werremeyer, President of Kinetic, founded In Stride.

39.    Werremeyer is both President and the sole incorporator of In Stride.

40.    The principal business address of In Stride is 29 Polhemus Drive, Hillsborough, New Jersey 08844, which his Werremeyer's home address.

41.    In August, 2004, after signing the 2004 License Agreement which prohibited Kinetic from introducing a new competitive brand, Werremeyer introduced "In Stride Shoes" at the American Podiatric Medical Association show.

42.    The shoes offered for sale and sold by In Stride are made from the same molds, patterns and designs used by Kinetic to make Etonic shoes.

43.    In Stride's "Sojourn" line of shoes is identical to the Etonic "Sojourn" line of shoes, except that the Etonic mark has been replaced with an In Stride mark inside the shoe.

44.    The "Sojourn" shoes sold by In Stride still contain other Etonic trademarks.

45.    Kinetic's Etonic shoe catalogue contains and advertises shoes that are identical to shoes advertised and sold by means of In Stride's catalogue.

46.    The In Stride "Malibu" shoe is the same as Etonic's "Essence" shoe.

47.    The In Stride "Venice" shoe is the same as Etonic's "Trieste" Shoe.

48.    Kinetic prepared and provided to customers sales materials offering both Etonic and In Stride shoes.

49.    Kinetic sales personnel marketed and sold In Stride shoes.

50.    Kinetic and In Stride operated adjacent booths at the 2005 World Shoe Association trade show that were run by the same people, registered with the same telephone and facsimile numbers, and offered shoes bearing the Etonic trademarks side-by-side with shoes bearing the In Stride trademark.

51.     Werremeyer has told customers that In Stride is an Etonic Athletic line of shoes.

52.     Werremeyer and Kinetic took the Etonic "Essence" shoe and manufactured the same shoe with the In Stride trademark.

53.     The molds, patterns and designs used to make the In Stride shoe are owned by Etonic.

54.     In Stride is the alter ego of Kinetic.

## COUNT I
## Breach of the 2004 License Agreement by Kinetic

55.     Etonic repeats and realleges paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56.     Since its execution of the 2004 License Agreement, Kinetic sold more that $2.5 million worth of Etonic shoes bearing Etonic trademarks to discounters, including Costco.

57.     Said sales were made without authorization from, and contrary to express instructions from, Etonic.

58.     On or about August, 2005, Werremeyer informed Etonic that he is seeking to make additional sales of Etonic branded footwear to Costco.

59.     Kinetic's sales of shoes bearing the Etonic trademarks to discounters constitutes a breach of the 2004 License Agreement.

60.     The sale of Etonic branded footwear by Kinetic to Costco and other discounters is damaging the upscale image of the Etonic trademarks and is causing irreparable harm to Etonic, including damage to the Etonic brand, and severely damaging Etonic's ability to sell products to high-end athletic shoe retailers.

61.     Since the effective date of the new License Agreement, Kinetic has breached that agreement by selling shoe styles bearing the Etonic trademarks that have not been approved by Etonic.

62.     Kinetic breached the 2004 License Agreement by creating the In Stride brand and selling Etonic branded shoes in conjunction with the In Stride brand, including but not limited to: (a) using the In Stride trademark on Etonic shoes; (b) using the In Stride trademark on shoes made with Etonic patterns and molds; (c) selling Etonic shoes bearing the In Stride trademark from which the Etonic mark had been scratched out; (d) selling shoes bearing the In Stride mark

that exactly replicate Etonic shoes; (f) selling shoes bearing both the In Stride trademark and Etonic trademarks; (e) advertising identical Etonic and In Stride shoes in the same catalogs; (f) deliberately creating the In Stride brand of shoes in a manner calculated to create confusion among the purchasing public; and (g) using the Etonic brand to develop and legitimize the In Stride brand, all without authorization from and contrary to the express demands of Etonic.

63.    Kinetic breached the 2004 License Agreement by selling and shipping products that are competitive with Etonic products, including but not limited to Etonic's DRx medical walking shoes.

64.    In breach of Section 5.1 of the 2004 License Agreement, Kinetic issued a press release on May 27, 2005, stating that Kinetic was "dropping" its License Agreement with Etonic. This press release was published on May 30, 2005, in *Footwear News*, the premier daily e-mail news service for people involved in the shoe industry. By publishing its press release in advance of the June 1, 2005 date set forth in the 2004 License Agreement, Kinetic caused irreparable harm to Etonic in the shoe industry.

65.    On numerous occasions since June 16, 2004, Kinetic misused the Etonic trademarks by marketing and selling "Hybrid" shoes showing the mark "Etonic" in a style that was not approved by Etonic.

66.    Since June 16, 2004, Kinetic has misused the Etonic trademarks by manufacturing and selling Etonic "Excel" shoes with a misspelled Etonic trademark on them. Those Etonic shoes bear the misspelled trademark "Stablite" instead of the licensed Etonic mark "Stabilite." The inclusion of a misspelled mark on Etonic footwear causes irreparable harm to Etonic.

67.    On numerous occasions since June 16, 2004, Kinetic has breached the 2004 License Agreement by marketing and selling Etonic shoes bearing the mark "E" that was never licensed by Etonic.

68.    Kinetic breached the 2004 License Agreement by failing and refusing to arrange sales calls in which an Etonic representative could participate.

69.    Kinetic breached the 2004 License Agreement by failing and refusing, despite numerous requests, to provide a written marketing plan and program for Kinetic's activities that had up-to-date information about Kinetic's activities.

70.    Kinetic breached the 2004 License Agreement by providing poor customer service and by failing to fill orders.

71.    Kinetic's poor level of customer service has caused and is causing irreparable harm to the Etonic brand and harms the ability of Etonic to sell Etonic shoes to existing and new customers after the termination of the 2004 License Agreement.

72.    Kinetic has breached, and is continuing to breach the 2004 License Agreement by failing and refusing to submit its advertising, packaging and labeling for approval by Etonic.

73.    In breach of the 2004 License Agreement, Kinetic has sold and is continuing to sell Etonic branded products through the Internet without obtaining the prior written approval of Etonic.

74.    Kinetic breached Section 6.3 of the 2004 License Agreement, through its President, Daniel Werremeyer, by forming In Stride and using Etonic trademarks in conjunction with the In Stride marks and/or trade name.

75.    By reason of the breaches alleged above, Etonic terminated Kinetic's license by letter dated August 12, 2005.

76.    Subsequent to such termination, Kinetic breached the 2004 License Agreement by failing and refusing to cease all use of the Etonic trademarks.

77.     Kinetic's conduct in breach of the 2004 License Agreement as set forth above has caused and is continuing to cause irreparable harm to Etonic as well as damages exceeding the amount of $75,000.

**COUNT II**
**Trademark Infringement by Kinetic**

78.     Etonic repeats and realleges paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79.     By continuing to market and sell footwear bearing the Etonic trademarks following termination of the 2004 License Agreement, Kinetic has infringed and is continuing to infringe the Etonic trademarks in violation of 15 U.S.C. § 1114(1).

80.     The conduct of Kinetic as above alleged has caused and is likely to continue to cause confusion, or to cause mistake or to deceive, in violation of Section 32(1)(a) of the Lanham Act, Section 1114(1)(a).

81.     The acts of Kinetic herein alleged have been committed with knowledge that its use and imitation of the Etonic trademarks is intended to be used to cause confusion, or to cause mistake or to deceive.

82.     As a result of Kinetic's conduct, Etonic has suffered, and will suffer damages in an amount not now precisely ascertainable, but which Etonic is entitled to recover at trial.

83.     Etonic's aforesaid trademark infringement has caused, and is likely to cause, irreparable harm to Etonic.  Etonic lacks an adequate remedy at law for the harm caused thereby.

**COUNT III**
**Unfair Competition Against Kinetic**

84.     Etonic repeats and realleges paragraphs 1 through 83 of this Complaint as if fully set forth herein.

- 12 -

85. The use by Etonic subsequent to the termination of the 2004 License Agreement of the Etonic trademarks is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Kinetic with Etonic, or as to the origin, sponsorship or approval by Etonic of the services of Kinetic, all in violation of 15 U.S.C. § 1125(a).

86. As a result of Kinetic's conduct, Etonic has suffered, and will suffer, damages in an amount now precisely ascertainable, but which Etonic is entitled to recover at trial.

87. Kinetic's aforesaid unfair competition has caused, and is likely to cause, irreparable harm to Etonic. Etonic lacks an adequate remedy at law for the harm caused thereby.

## COUNT IV
### Trademark Dilution Against Kinetic

88. Etonic repeats and realleges paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89. By its conduct, Kinetic has caused dilution of distinctive quality of the Etonic trademarks.

90. Said conduct on behalf of Kinetic was willful and constitutes and was engaged in with willful intent to trade on Etonic's reputation or to cause dilution of Etonic's trademarks.

91. By reason of its conduct, Kinetic has caused, and is continuing to cause, irreparable harm to Etonic.

92. By its conduct, Kinetic has caused Etonic to sustain damages.

## COUNT V
### Trademark Infringement by In Stride

93. Etonic repeats and realleges paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94. By advertising and selling footwear bearing the Etonic In Stride has infringed and is continuing to infringe the Etonic trademarks in violation of 15 U.S.C. § 1114(1).

95.     The conduct of In Stride as above alleged has caused and is likely to continue to cause confusion, or to cause mistake or to deceive, in violation of Section 32(1)(a) of the Lanham Act, Section 1114(1)(a).

96.     The acts of In Stride herein alleged have been committed with knowledge that its use and imitation of the Etonic trademarks is intended to be used to cause confusion, or to cause mistakes or to deceive.

97.     As a result of Kinetic's conduct, In Stride has suffered, and will suffer damages in an amount not now precisely ascertainable, but which In Stride is entitled to recover at trial.

98.     Etonic's aforesaid trademark infringement has caused, and is likely to cause, irreparable harm to Etonic.  Etonic lacks an adequate remedy at law for the harm caused thereby.

## COUNT VI
### Unfair Competition Against In Stride

99.     Etonic repeats and realleges paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.    By using Etonic's shoes, by using Etonic's shoe designs, molds, and dies to make shoes, and by replacing or obliterating the Etonic marks in such shoes and replacing them with In Stride's mark, In Stride has infringed, and continues to infringe, Etonic's trade dress.

101.    By advertising and selling Etonic shoes as In Stride shoes, and by using the Etonic marks in its marketing and sale of shoes bearing the In Stride mark In Stride misappropriated Etonic's good will.

102.    The conduct of In Stride as above alleged constitutes unfair and deceptive acts or practices as well as false advertising.

103.    The aforesaid conduct of In Stride has caused and is likely to cause customer confusion.

104.    The foregoing conduct of In Stride and Werremeyer constitutes the use in commerce of words, terms, names, symbols, or devices, or combinations thereof, or false designations of origin, false or misleading description of fact, or false or misleading misrepresentations of fact which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of In Stride with Etonic, or as to the origin, sponsorship or approval of In Stride's good services or commercial activities by Etonic, all in violation of Section 43(a) of the Lanham Act, 25 U.S.C. § 1125(a)(1).

105.    The foregoing conduct of In Stride and Werremeyer has caused and is causing Etonic to suffer irreparable harm.

106.    The foregoing conduct of In Stride and Werremeyer has caused and is causing Etonic to suffer damages in an amount yet to be ascertained.

**COUNT VII**
**Trademark Dilution Against In Stride**

107.    Etonic repeats and realleges paragraphs 1 through 106 of this Complaint as if fully set forth herein.

108.    The above alleged of In Stride has caused dilution of a distinctive quality of Etonic's famous marks.

109.    Said conduct of In Stride has been and is willful.

110.    Said conduct of In Stride violates Section 43(c) of the Lanham Act, 25 U.S.C. § 1125(c)(1).

111.    The above alleged conduct of In Stride has caused and is continuing to cause Etonic to suffer irreparable harm.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that this Court:

- 15 -

(a)     temporarily, preliminarily, and permanently enjoin Kinetic and In Stride, their agents, servants, officers, employees and representatives, and all other persons, firms or corporations in active concert or participation with it,

      (i)     from making any use of any of the Etonic trademarks in connection with the manufacturing, marketing and/or sale of footwear

      (ii)    from engaging in any further act of infringement of Etonic's trademarks and trade name;

      (iii)   from offering, providing, promoting, marketing, or advertising any goods using Etonic's trademarks, trade name, or any colorable imitation thereof;

      (iv)    from engaging in any conduct that tends to confuse, cause mistake, or to deceive as to the affiliation, connection or association of Kinetic and/or In Stride with Etonic, or as to the origin, sponsorship or approval by Etonic of the products of Kinetic and/or In Stride;

      (v)     from making any use of the mark "IN STRIDE" in connection with footwear;

(b)     order Kinetic and In Stride to deliver up to Plaintiff for destruction or other disposition any inventory of shoes and all advertising, promotional material, or other material in its possession or control, that bear any of the Etonic trademarks, the tradename ETONIC, or the mark IN STRIDE ;

(c)     order Defendants to recall from all channels of distribution any goods or materials distributed by them, or either of them, that bear the marks or names ETONIC or IN STRIDE, or any colorable imitations thereof;

(d)     order In Stride to assign and convey to Etonic all rights and interest in and to the trademark "IN STRIDE."

(e)     award damages according to proof at trial that Etonic has suffered as result of Defendants' acts of infringement and unfair competition;

(f)     award to Plaintiff the profits realized by Defendants as a result of its acts of infringement and unfair competition;

(g)     award Plaintiff the costs of action, including reasonable attorney's fees, pursuant to 15 U.S.C. § 1117;  and

(h)     grant Plaintiff such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury as to all issues.

ETONIC WORLDWIDE, LLC
By its attorneys,

David A. Ward (DAW 7669)
Arthur D. Grossman
Robert J. Rohrberger
FOX & FOX LLP
70 South Orange Avenue
Livingston, NJ  07039
Tel: (973) 597-0777
Fax: (973) 597-0884


Of Counsel:
Sibley P. Reppert
LAHIVE & COCKFIELD, LLP
28 State Street
Boston, MA  02109 - 1784
Tel: (617) 227-7400
Fax: (617) 742-4214

## LOCAL RULE 11.2 DECLARATION

Pursuant to Local Rule 11.2, I hereby declare that the within matter is not the subject of any other action pending in any court, arbitration, or administrative proceeding but is related to a matter previously filed in the United States District Court, District of New Jersey, and heard before the Honorable Garrett E. Brown, Jr., captioned *Kinetic Sports, Inc., v. Etonic Worldwide, LLC*, Civil Action No. 2564-04.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 15, 2005

Fox and Fox, LLP

David A. Ward (DAW 7669)

# EXHIBIT 1

# LICENSE AGREEMENT

THIS LICENSE AGREEMENT, made and entered into as of this 16th day of June 2004, by and between Etonic Worldwide LLC, a Delaware limited liability company having its principal place of business at 260 Charles Street, Waltham, Massachusetts 02493 (hereinafter referred to as "Etonic") and Kinetic Sports Inc., a New Jersey corporation having its principal place of business at 216 Route 206 South, Suite 18, Hillsborough, NJ 08844 (hereinafter referred to as "Company").

Except as set forth herein, this License Agreement supersedes the License Agreement dated as of January 1, 2000 between Spalding Sports Worldwide, Inc. and Orion Sports and Leisure, Inc., as amended by the Assignment and Assumption Agreement dated as of June 22, 2000, as transferred to Etonic through an Asset Purchase Agreement dated as of April 8, 2003, and as amended by an Amendment Agreement between Kinetic Sports, Inc. and Etonic Worldwide LLC dated as of July 8, 2003, subject to the provisions of Section 8.7 hereof.

## Section 1.1: Articles

The term "Articles" shall mean the following items bearing or used in conjunction with the Trademark: Men's and Women's performance grade athletic shoes (but specifically excluding (a) golf shoes and casual shoes sold as part of the Etonic golf shoe line, and (b) bowling shoes and casual shoes sold as part of the Etonic bowling shoe line).

It is the expectation of Etonic that the Etonic performance athletic line will be designed, developed and priced within an appropriate ratio to the Etonic golf shoe line, thereby ensuring a consistent price-value and seamless market positioning to both the consumer and the trade for the Etonic brand.

The Etonic product line must adhere to the product principles in Exhibit "G".

Company shall have the right of first refusal on the Etonic children's athletic shoe business for the Etonic mark, should it be deemed by Etonic that the development of the children's category is appropriate for the Etonic brand.

Company shall immediately stop making the Wexford and the Sojourn styles, and will sell its existing inventory in the normal course of business.

The new technical running shoe, called the Hybrid, may be launched by Company and the cost of the molds will be amortized at $3.00 per pair. The remaining cost (if any) will be paid by Etonic, but only after the molds are in Etonic's possession. If there is no remaining cost (if the molds are fully amortized), Etonic will still receive the molds. Whether the Hybrid is launched or not by the Company, the design of the Hybrid is owned by Etonic and will not be used by Company except to make Articles.

## Section 1.2: Territory

The term "Territory" shall mean the following: Worldwide, with the following exceptions: Japan and Argentina are specifically excluded. Etonic agrees that upon expiration of each license agreement between Etonic and its licensees in Japan and Argentina, and with a Business Plan submitted to and written approval received from Etonic by the Company for each territory (Japan and Argentina), each such country will also be included in the Territory. Etonic Canada Inc. (or such other Etonic designee or affiliates) shall be the Company's distributor for all Articles in Canada.

1

Prior to selling Articles in any countries or territories in which the Articles have not been previously distributed a Business Plan for each such country or territory (using the template shown on Exhibit E but with the addition of the name, address, phone number and business history of the proposed distributor), must be submitted to Etonic and Company must receive Etonic's prior written approval for distribution and sale of the licensed products in each such country or territory.  Company represents and warrants that there are no existing sublicenses, except for Argentina.  Within thirty days of the Effective Date, Company shall provide to Etonic copies of all distributorship agreements and any other agreements applying to international business.

## Section 1.3: Assignment of "DRx"; Trademark

Simultaneously with the signing of this Agreement, Company shall assign to Etonic the trademark "DRx" and Etonic shall license DRx back to Company until December 31, 2005.  The term "Trademark" shall mean the Etonic trademark as represented in the attached Exhibit A. The term "Trademark" shall also include the Etonic sub brands known as "Eon Air", Stabilite, DRx and "Stable Air" (together, the "Sub Brands"). Company shall not use the Sub Brands apart from the Etonic trademark, and all use of the Sub Brands shall otherwise conform to the provisions of this Agreement. Use of the Trademark shall be only as permitted in the most current Identity Manual published by Etonic from time to time with respect to use of its trademarks generally.

Company will assign all domain names with "Etonic" or "DRx" in them, except for a possible transition period for etonicathletic.com.  But in any event, even etonicathletic.com shall be assigned by December 31, 2005.

## Section 1.4: Net Sales Price

As used herein, the term "Net Sales Price" shall mean the invoice price charged for Articles sold and shipped by Company to the retail trade, less allowances (other than co-op advertising), returns, quantity discounts, trade and cash discounts, and taxes; provided, however, that in the case of Articles sold by Company to any other individual, corporation, partnership or association which in the opinion of Etonic is so closely allied to Company as to prevent arms length bargaining, the Net Sales Price shall be deemed to be the Net Sales Price charged by Company for similar articles sold in the same period to similar customers not so closely allied. If there are no such other sales, then the Net Sales Price shall be the Net Sales Price of such related customers of Company to its customers. In computing Net Sales, no direct or indirect expenses or costs incurred in manufacturing, selling, distributing, or advertising Articles shall be deducted except as noted above, nor shall any deduction be made for uncollected accounts.

## Section 1.5: Effective Date

The term "Effective Date" of this Agreement shall be June 16, 2004.

## Section 2.1: Grant

The registered owner of the Trademark in the United States is Etonic. The registered owner of the Trademark elsewhere is Etonic.

Etonic hereby grants to Company the exclusive right and license to utilize the Trademark solely upon and in conjunction with the sale and distribution of Articles in the Territory, subject however to the restrictions and conditions hereinafter set forth. Company acknowledges Etonic's exclusive rights in the Trademark and agrees that it will use the same only so long as and only in the

2

manner authorized by this Agreement. The license granted herein does not include the right to sublicense the use of the Trademark.

Company shall be permitted to have the Articles manufactured solely for it by a third party upon the prior written approval of Etonic, provided and upon the express condition that prior to the commencement of such manufacture, said third party shall duly execute and deliver to Etonic a letter in form and content as attached hereto as Exhibit B. Company agrees that the utilization of such a manufacturer shall not in any way reduce its obligations to Etonic under this Agreement, including but not limited to the quality control and trademark notice provisions of this Agreement. Any default by said manufacturer of said letter or the obligations referenced therein shall constitute default of this Agreement by Company.

Etonic and Company acknowledge that Etonic has entered into an agreement with Sports Car Club of America, Inc. (the "Trans Am Agreement") which gives Etonic the right to use the Trans Am logo in connection with the manufacture and sale of athletic shoes. Etonic hereby assigns Company such rights under the Trans Am Agreement as are necessary for Company to use the Trans Am logo in connection with the manufacture and sale of Articles hereunder. Etonic hereby reserves all other rights under the Trans Am Agreement not assigned to Company hereunder. The expiration or other termination of this Agreement shall act as a termination of the assignment granted herein.

Etonic shall pay all royalties due Sports Car Club of America, Inc. under the Trans Am Agreement. Company shall be given a copy of the Trans Am Agreement and shall observe and perform all of Etonic's obligations thereunder insofar as the manufacture and sale of Articles are concerned. Company shall further indemnify and hold Etonic harmless from and against any liability, including Etonic's attorneys' fees and costs of defense, resulting from Company's failure to observe and perform the Trans Am Agreement as required hereby.

Etonic hereby represents and warrants that the Trademark is (i) owned exclusively by Etonic, free and clear of all liens and encumbrances (except those in favor of Etonic's senior lenders), (ii) in full force and effect in the Territory, and (Hi) not subject to any agreement granting any other person or entity the right to use the Trademark in the Territory (except as otherwise expressly set forth herein). In this connection, Etonic agrees to indemnify and hold Company harmless from any and all liabilities, claims, losses, or expenses (including reasonable attorneys fees) arising out of or in connection with any claims asserted against Company based on any violation or breach of any of the representations or warranties set forth above.

## Section 3.1: Term

The Term of this Agreement shall be from the Effective Date to December 31, 2005, on which date it shall automatically terminate. No notice of termination shall be required, and Company shall have no renewal rights whatsoever.

## Section 4.1: Royalties Payable by Company

For the rights granted to Company hereunder, Company shall pay Etonic a royalty upon all shipments of all Articles. The rate of royalty shall be in accordance with Exhibit C and levied on the Net Sales Price of said Articles.

Royalty payments due from Company shall be determined on a quarterly basis, commencing on the Effective Date. Such royalties will be paid by Company within twenty-five (25) days following the

3

end of each quarter on all Articles sold and shipped by Company during said quarter, in accordance with Exhibit D, accompanied by a complete written report in form and content as shall be specified by Etonic from time to time.

On December 24 of each contractual year, Company shall pre-pay to Etonic an estimate of the royalties that Company reasonably expects to be due for October/December shipments. The following January 25 Company will report to Etonic its actual earned royalties during October/December period, and if actual royalties due Etonic are greater than the estimated amount paid to Etonic on December 24, then Company will pay the difference to Etonic with its January 25 statement. If the estimate was greater than actual royalties, Etonic will credit the difference to the following quarterly royalties due it.

All royalty payments to be made hereunder by Company shall be paid to Etonic in United States dollars into an account as and where designated by Etonic from time to time.

All royalty payments shall be paid without any deduction, set-off or counterclaim whatsoever.

The termination of this Agreement shall not discharge or release Company from liabilities and responsibility accruing prior to such termination, including, but not limited to, the payment of royalties in accordance with this Agreement. Nothing in this Section shall prejudice the rights of action or remedies which Etonic might otherwise have in connection with the enforcement or breach of this Agreement.

## Section 4.2: Minimum Royalty

Company agrees to pay Etonic a nonrefundable minimum royalty in accordance with the schedule of Exhibit C.

On or before the 25th day of the first month of each quarter of each year (January 25, April 25, July 25, October 25) Company shall pay Etonic twenty five percent (25%) of the total annual minimum royalty. However if during the course of a particular year Company's total royalty payments to Etonic (earned and minimum royalties) exceed the total minimum royalty for that year, then only earned royalties shall be paid to Etonic by Company during the balance of that year (see Exhibit D).

If the shipments in any specified one-year period are not sufficient to provide royalties equal to the minimum royalty, credit for the excess of the minimum royalty over the actual earned royalty shall not be carried forward into the next period.

## Section 4.3: Royalty Records And Audits

Company shall keep full and accurate records showing the number, Net Sales Price, and date of shipment or other transfer of all Articles shipped or otherwise transferred by Company.

With each royalty payment, Company shall furnish Etonic a report signed by a responsible official of Company showing the number and Net Sales of Articles first shipped during the period covered by the report, and such other information and detail as shall be requested by Etonic from time to time.

Furthermore, Company shall instruct its external auditors to remit to Etonic on a yearly basis, an audited report showing the sales and pertinent financial information referring to the licensed Articles, and Company shall make its records available for inspection, at reasonable intervals, upon written request, at Company's place of business during normal business hours, and on a confidential basis, by Deloitte & Touche, or other certified public accountant appointed by Etonic and at Etonic's sole expense except as qualified below, who shall certify to Etonic their opinion of the amount of royalties

4

due for the period examined, gross and net sales (including itemized deductions), promotional spending (measured media, point-of-sale, free goods, promotions), reduced margin goods and current inventory levels.

The findings and opinion of said certified public accountant shall be conclusively binding upon the Company. If the audit shows an underreporting or underpayment of more than five (5%) percent of royalties for any year, then the Company shall reimburse Etonic for the cost of the audit. Such remedy shall be in addition to Etonic's other remedies under this Agreement, including termination.

Any adjustments requiring additional payments to Etonic as a result of the audits will accrue interest from the date originally due at one and one-half percent (1.5%) per month or the highest lawful rate, whichever is lower.

## Section 5.1: Company Relationships

Except as hereinafter set forth, the Company and Etonic may secure other licenses for competitive products and may engage either directly or indirectly in the research, design, development, marketing, advertising, promoting, merchandising, shipping, distributing, or selling of any performance footwear products except, however, that they may not offer such products for sale prior to June 1, 2005, and neither party shall ship such products until January 1, 2006, and provided further that any such products offered by Company shall not replicate patterns or molds used for or are confusingly similar to any Articles. Company can sell competitive products to Articles beginning June 1, 2005 and Etonic (or a new licensee) can sell any and all products, including Articles or products competitive with Articles as of June 1, 2005, but neither party shall ship these products until January 1, 2006.

Company will not use the same or confusingly similar patterns or molds as those used for the Articles in any products it creates or sells under any other marks.

Additionally, Company agrees that during the term of the Agreement, it will not actively pursue the employ of existing Etonic or Etonic personnel without the explicit and prior written permission of the President and CEO of Etonic.

*Etonic acknowledges Company's existing relationship with Wilson and will not object to the continuance of that relationship provided it is not expanded beyond its current scope.

Etonic and Company acknowledge that they are entering into this License Agreement pursuant to and in accordance with their settlement of a lawsuit entitled Kinetic Sports, Inc. v. Etonic Worldwide LLC, filed in the United States District Court for the District of New Jersey, Civil Action Number 3:04-cv-02564 (GEB JJH) (the "Lawsuit"). Etonic and Company agree to keep the terms of the settlement of the Lawsuit confidential from customers and salespeople until June 1, 2005, but may state that the matter has been settled.

At any time Company may speak to external parties (such as brand owners and designers) to prepare its future business, and Etonic may speak to external parties (such as designers, agents and manufacturers) in expectation of taking over the Etonic mark as a whole and to prepare its future business. Prior to any such disclosures, such external parties shall be advised of the confidential nature thereof.

Within ninety days of the Effective Date, Company will provide access to Etonic to Company's international contacts and will supply copies of any contracts related to the Etonic brand.

5

Within ninety days of the Effective Date, Company will provide to Etonic all old samples, catalogs, and documents related to the history of the brand in Company's possession.

Within ninety days of the Effective Date, Company will provide customer lists, distributor lists, salespeople contacts to Etonic within one month of signing the new license agreement.

As of the Effective Date Etonic may participate in sales calls with customers.

As of the Effective Date Etonic may meet salespeople and discuss customers, customer terms, pricing.

Within ninety days of the Effective Date, Company will explain Special Make-Up (SMU) shoes, terms, customers, pricing.

Within ninety days of the Effective Date, Company will provide Etonic with a pair per style number of lasts, and if Etonic wants a pair of lasts for every size of every style, Etonic will purchase at cost.

## Section 5.2: Diligence

If in any calendar year during the Term of the Agreement, Etonic does not earn and receive royalties on Company's sale of Articles equal to the minimum royalties as set forth in Exhibit C, then Etonic, at its sole discretion, may terminate this Agreement upon notice given to Company, notwithstanding anything contained in this Agreement to the contrary.

Company will exercise all possible efforts to exploit and to promote, at its own expense, the sale and the use of all Articles in the Territory, and to sell the same as widely as possible and at the best price obtainable. Company will continuously offer for sale all Articles and distribute to promptly meet orders for all Articles.

Company shall, at all times, achieve an average order fill in any given season of at least 80%.

## Section 5.3: Marketing

No later than ninety (90) days after the date this Agreement is signed by Company, and no later than ninety (90) days prior to each annual anniversary of the Effective Date of this Agreement, the Company will provide Etonic in accordance with Section 8.3 a written marketing plan and program for Company's activities with respect to each category of Articles in the Territory for the coming year in form, content, detail and substance acceptable to Etonic's sole discretion per the attached Exhibit "E". Etonic shall notify Company in writing of its approval or disapproval of said marketing plan within 14 days of its receipt and such approval shall not be unreasonably withheld. But in the event of said disapproval, Etonic shall have the right to terminate this Agreement for any or all Articles and for any or all countries in the Territory upon the giving of written notice to Company, notwithstanding anything contained in this Agreement to the contrary unless the plan is modified by Company to cure the reason(s) for disapproval within 30 days of receipt of Etonic's disapproval. Etonic may, in its sole discretion, require as a part of said marketing plan and program that Company, at its sole cost, appoint and continuously maintain one or more of its executives acceptable to Etonic for the sole or primary purpose of assuring Company's establishment of, and compliance with, said marketing plan and program. Company shall diligently use its best efforts to comply with the provisions of said approved marketing plan and program.

The parties acknowledge that the following reflects their current mutual marketing and sales

6

philosophies for Etonic branded products:

    (a)    Quality - Company will maintain high quality standards for Etonic branded footwear and apparel.

    (b)    High Performance - Company shall use its best efforts to incorporate state-of-the-art high performance technical features and competitive designs in all Etonic branded footwear and apparel.

    (c)    Distribution - Company will sell Etonic branded footwear and apparel only to such markets as will enhance the upscale image of the Trademark.  Company shall be in default if sales of the Articles are made to "discounters", as that term is commonly understood by the parties as of the Effective Date.

Etonic will respond to reasonable requests from Company for information regarding Etonic golf shoes marketing plans. This sharing of information will make the distinction between Etonic athletic and golf shoes seamless and the positioning of the two businesses consistent.

## Section 5.4: Customer Service

Company acknowledges that the reputation and success of Etonic and the Trademark are dependent on the excellence in levels of customer service. Therefore, Company agrees to use best efforts to continuously provide customer service on Etonic branded business at a high level of quality, commensurate with the excellence normally expected from a well-known, national brand company, including, but not limited to, the following:

(a)    Adequate levels of inventory to satisfy customer needs by consistently shipping orders at minimum of eighty percent (80%) complete;

(b)    Timely schedules of shipment against customer requests by consistently shipping ninety percent (90%) of customer orders within fifteen (15) days of the due date; if the order was placed within lead times.

(c)    Customer service representatives whose function is to handle Etonic customer inquiries and who will consistently answer a minimum of ninety percent (90%) of customer/consumer inquiries within five (5) working days of receipt;

(d)    An 800 number for customer use.

## Section 6.1: Licensed Articles Approval

Company shall promptly submit to Etonic's representative first run specimens of each Article on which the Trademark is used, together with written specifications for each article in a form satisfactory to Etonic, and a written request for approval of the specimen and specifications. Thereafter, at Etonic's request, Company shall submit to Etonic for quality examination two (2) samples of each of the Articles which are currently being marketed under the Trademark. Company shall at the same time provide Etonic with results of quality control testing against specifications in a form satisfactory to Etonic. Further, at all times, Company's inventory shall be available to Etonic for random quality control sampling with twenty-four (24) hours' notice. Within thirty (30) days after the receipt of the specimens and specifications or samples, as the case may be, Etonic shall notify Company of its approval or

7

disapproval thereof, which approval shall not be unreasonably withheld. The production runs of each of such approved Articles shall be in accordance with agreed-upon production specifications. Any substantial or continuing unrectified breach of the quality control provision of this Section shall be grounds for termination.

Section 6.2:  Advertising, Packaging and Labeling

The Company shall submit in writing to Etonic or its authorized representative for its approval all advertising and packaging and other material prepared by or for it, during conceptual stages before the same is used, circulated or displayed. In the event that Etonic does not notify Company in writing of its disapproval within thirty (30) days of said submission, such material shall be deemed to have been approved by Etonic. The foregoing procedure shall also govern the approval of advertising, packaging, promotional and other graphic material to be utilized in customer cooperative advertising. Upon approval by Etonic, Company shall be free to utilize such material in its approved form for the lesser of one (1) year, or the termination of this Agreement for any reason. Company shall be solely responsible for monitoring and maintaining its customers' compliance with the approved material. In this regard, Company shall submit to Etonic upon request suitable proof (i.e., "tear sheets") that said cooperative advertising material is being properly utilized.

Should Company grant to a third party permission to publish or air the Trademark, Company shall be responsible for ensuring compliance with the aforementioned conditions.

Company further agrees to furnish upon a reasonable request by Etonic, samples of the Articles for use in any Etonic advertising or any other Etonic, distributor or licensee advertising, promotion, and presentation at no cost to Etonic for such purpose.

Section 6.3: Registration and Protection of Trademark

Except as otherwise agreed in writing, in no event shall Company deviate in any manner in its use of the Trademark from the form of the Trademark set forth in the attached Exhibit A.

Company agrees to cooperate fully and in good faith with Etonic for the purpose of securing and preserving Etonic's right(s) in and to the Trademark. If Etonic requests, Company shall, at Etonic's expense, file and prosecute one or more applications for trademark registrations in the appropriate office(s) or class(es) in the name of Etonic, or, if Etonic so requests in writing, any other name designated by Etonic. It is agreed that nothing contained in this Agreement shall be construed as an assignment or grant to Company of any right, title or interest in or to the Trademark, it being understood that all rights relating thereto are reserved by Etonic, except for the license granted hereunder to Company. Company hereby agrees that upon expiration or termination of this Agreement for any reason, Company will be deemed automatically to have assigned, transferred and conveyed to Etonic any and all copyrights, trademark or service mark rights, equities, goodwill, or other right, title or interest in and to the Trademark and any variation thereof which may have been obtained by Company or which may have vested in Company in pursuance of any endeavors covered hereby. Company will execute, and hereby irrevocably appoints Etonic its attorney-in-fact to execute, if Company refuses to do so, any documents requested by Etonic to accomplish or confirm the foregoing. All artwork and designs involving the Trademark, or any reproduction thereof, shall, notwithstanding their invention or use by Company, be and remain the sole property of Etonic and Etonic shall be entitled to use the same and to license the use of the same by others. Etonic shall have the sole right to determine whether or not legal or other action shall be taken to protect the Trademark, and Etonic shall have sole control over the form of such action and any settlement of such disputes with third parties with respect to such action. Company shall cooperate fully in the prosecution of any action to protect the Trademark at

8

Etonic's expense.

Company agrees that it will not in any way register or use the Trademark or any similar name alone or in conjunction with any other words as a tradename or trademark, nor will the Trademark be used by Company in the name of any corporation, partnership or other business entity.

## Section 6.4: Trademark Notice

Company agrees that its name and address must appear on the Articles or packaging. Whenever the Trademark is used, there shall also be a notice of the fact that the Trademark is owned as follows: "The Etonic trademark is used under license from Etonic Sports Worldwide LLC" or such other notice as specified by Etonic from time to time in form, size and location approved by Etonic in writing.

Company agrees that as an essential condition hereof, it will cause the foregoing appropriate notice or any other notice specified by Etonic to so appear on each and every Article (either tag, label, imprint, or packaging) and in all advertising prepared by or for Company. All shall be submitted by Company to Etonic for its written approval prior to use by Company. Approval by Etonic shall not constitute waiver of Etonic's rights or Company's duties under any provision under this Agreement. Company will specifically put the Trademark notification on letterhead, hangtags, website, stationery, catalogs.

All inventory and advertising material included in the Bill of Sale are excluded from this Section as long as they are sold or phased out within one year from the effective date of this Agreement.

## Section 6.5: Other Trademarks

Company shall not place or use other trademarks, tradenames, designs, logos or endorsements in conjunction with the Articles, except as specifically authorized by Etonic in writing before the commencement of such use. In the event of such authorized use, Company shall, at Etonic's option, assign said other trademarks, designs, logos, or endorsements to Etonic upon termination of this Agreement, and in the event of such assignment Company will execute and deliver to Etonic any documents requested by Etonic necessary to effect such assignment.

## Section 6.6: Goodwill

Company recognizes the goodwill inherent in the Trademark and acknowledges that the goodwill attached thereto belongs to Etonic and that such Trademark has secondary meaning in the minds of the public. Company agrees that it will not during the term of this Agreement or thereafter attack or contest property rights of Etonic in and to the Trademark or attack or contest the validity of the Trademark.

In order to maintain said goodwill, Company will promptly and to the satisfaction of Etonic resolve any consumer complaints that may arise from time to time with regard to Articles or any promotion thereof.

## Section 6.7: Premium

Company may not use Articles as prizes or in connection with contests without prior written approval of Etonic. Company may not use the Trademark on any Articles involved in any sweepstakes, lotteries, games of chance, or as a premium except that Articles may be used in the promotion of or as a premium in the sale of Articles.

9

### Section 6.8: Internet Sales

Company shall not advertise, market, promote or sell the Articles through the Internet or the World Wide. Web without first obtaining the written approval of Etonic. Etonic acknowledges that the Company presently has a website and that the Company and Etonic shall work together to integrate their respective websites.

### Section 6.9: Trade Shows

Company may display, at its expense, the Articles at trade shows and the like, but only within booths or separate and distinct areas displaying Etonic products and only in a manner consistent with the presentation of Etonic products. For trade shows attended by both the Company and Etonic, Company shall display, at Company's expense, the Articles at trade shows only in the Etonic booth, except as agreed otherwise by Etonic in writing.

### Section 6.10: Showroom

Company shall have a showroom in New Jersey with an area dedicated exclusively to the Articles. Showroom minimum square footage, design and display must be approved in advance by Etonic.

### Section 6.11: Complimentary Product

During each year of the Term, Company shall provide to Etonic, free of charge, one representative sample set from top of production of the Articles for Etonic advertising and promotional purposes and one representative sample set for each of Etonic's showrooms.

### Section 7.1: Default and Termination

This Agreement may be terminated by either party upon default or breach of warranties of the other party, by giving said other party written notice of intention to so terminate, which notice shall specify the default or breach upon which the notifying party intends to rely, and such termination shall become effective thirty (30) days from the receipt of such notice provided such default or breach is not rectified by the notified party within that time or a time agreed upon by the parties in writing. Additionally, three (3) or more rectified defaults and/or breaches of the warranties of this Agreement by Company during any twelve (12) month period shall be grounds for immediate termination of this Agreement by Etonic. Any breach of any prior license agreement between Etonic and Company shall not constitute one of the three breaches named in the previous sentence. Termination shall be without prejudice to any rights, remedies or claims Etonic may otherwise have against Company.

The license agreement herein granted shall terminate immediately if Company ceases to do business, makes an assignment for the benefit of creditors, enters into a composition, becomes insolvent, or if a petition in bankruptcy is filed and said petition is not dismissed within thirty (30) days.

Etonic shall have the right to terminate this Agreement in the event of any substantial change in the ownership, control, officership or management of Company. Company shall immediately notify Etonic in writing of any of the events referenced in this Section.

Notwithstanding anything in this agreement or otherwise to the contrary, in the event of Company's default, all unpaid royalties due on Company's actual sales of articles shall become immediately due and payable, and the minimum royalties specified in Section 4.2 and any exhibit hereto for the next 12 months following the termination date shall all become immediately due and payable as liquidated damages, notwithstanding the contract year otherwise specified for payment on such exhibit.

10

Upon termination of this Agreement, all rights of Company to manufacture, sell and distribute Articles shall cease, and all royalties on shipments theretofore made shall become immediately due to Etonic, notwithstanding anything herein to the contrary.

## Section 7.2: Inventory at Expiration or Termination

Upon termination of this Agreement for any reason, Company shall immediately discontinue manufacture, advertising, sale and distribution of Articles or any use of the Trademark (including but not limited to advertising, signs, letterheads, and packaging materials), except that if because of the expiration of the term of this Agreement, and not because of Company's default due to quality problems or non payment of royalties, then in such event Company shall be permitted to sell or otherwise distribute its finished inventory of all Articles at the time of such termination and such inventory as may be in the process of production, for a period not to exceed one hundred eighty (180) days after termination of this Agreement on a non exclusive basis, provided that Company pays all royalties and submits all reports in connection with such sales as required under the terms of this Agreement. Within thirty (30) days of receipt of notice of termination, or within thirty (30) days of the termination in the event that the termination automatically occurs pursuant to Section 3.1, Company shall furnish Etonic with a written statement of the Articles in inventory, and in the process of production at that point in time, and a marketing plan for the disposal of said inventory, and thereafter Company will provide Etonic monthly inventory reports until all Articles are sold.  All inventory sold during the one hundred eighty (180) days shall be to the same customers as current.

## Section 8.1: Indemnification

Company shall be solely responsible for and agrees to indemnify Etonic, its officers, directors, agents and employees, and to hold each of them harmless from any claims, demands, causes of action or damages, including reasonable attorney's fees, arising out of or in connection with the manufacture, sale, distribution, advertising, promotion, labeling or use of Articles notwithstanding any approval which may have been given by Etonic. Each party will promptly notify the other of any such claim and shall keep the other fully advised.

## Section 8.2:  Insurance

Company agrees that, throughout the term of this Agreement and for not less than five (5) years following the termination of this Agreement, it will maintain comprehensive general liability insurance, including blanket contractual liability and personal injury liability, and insurance against claims based upon products liability for the Articles and against other claims covered by the indemnification provision of Section 8.1, in an amount of not less than Two Million Dollars ($2,000,000.00) combined single limit. Such insurance shall be written on an occurrence policy form with an insurance company with a current Best rating of A, XII or better. Company shall cause its insurance policies to be in force from the Effective Date of this Agreement and endorsed to include Etonic, its officers, directors, employees and agents as additional insureds thereunder. Such endorsement shall stipulate that the required coverages will not be reduced or canceled without thirty (30) days prior written notice to Etonic. Such endorsement shall also stipulate that it is the primary coverage and any other insurance in force for the additional insureds shall act as excess coverage only and shall not be required to contribute in the payment of any claim made hereunder to the extent of the limits of liability afforded by Company's insurance hereunder.

Evidence of said coverage shall be supplied to Etonic within thirty (30) days of the Effective Date of this Agreement. If Company fails to comply with any insurance requirement, Etonic at its

11

election may terminate this Agreement without further notice.   In the event Etonic at any time believes Company's existing insurance coverage does not provide adequate protection, Etonic may, in its sole but reasonable discretion, require Company to increase the amount of coverage required hereunder to a level deemed adequate by Etonic.

<u>Section 8.3: Notice</u>

All royalty reports, monthly 12 month rolling sales forecast as required by this Agreement (Exhibit "F"), marketing plans and programs to Etonic provided for herein shall be in writing and mailed or faxed to:

ETONIC WORLDWIDE LLC<br>
260 Charles Street<br>
Waltham, MA 02493<br>
Attn: Tom Seeman

or to such other address as shall be designated by Etonic from time to time.

All other notices, statements, and reports required or permitted to be given under this Agreement shall be in writing and shall be by registered or certified mail, return receipt requested, addressed to the party to whom such notice is required to be given. All such notices shall be deemed to have been given when mailed as evidenced by the postmark at the point of mailing.

All notices to Etonic shall be addressed as follows:

ETONIC WORLDWIDE LLC<br>
260 Charles Street<br>
Waltham, MA 02493<br>
Attn: Tom Seeman

All notices to Company shall be addressed as follows:

Kinetic Sports, Inc.<br>
216 Route 206 South, Suite 18<br>
Hillsborough, N. J. 08844

Attn: President

or to such other address as shall be designated by Company from time to time.

<u>Section 8.4: Assignment</u>

This Agreement shall be binding upon successors and assigns of the parties hereto; provided, however, that Company shall not delegate its duty of performance or assign or otherwise alienate its rights or obligations under this Agreement without first obtaining the written consent of Etonic, which granting or withholding of consent shall be in Etonic's sole discretion, and any attempted delegation, assignment or alienation without such written consent shall be a default of this Agreement. Notwithstanding the foregoing, Company may assign its rights hereunder one time only to a corporation or limited liability company owned by or under common control with Company provided (i) Company first provides Etonic with such information concerning the proposed assignee and its owners as Etonic requests, (ii) Company and the proposed assignee sign such documentation as Etonic requests in order to effectuate such assignment and (iii) Company and the proposed assignee shall thereafter be jointly and severally liable for performance of all Company's liabilities and obligations hereunder including, without limitation, payment of all royalties and other sums due or to become due Etonic hereunder.

12

## Section 8.5: Confidential Information

The parties agree to keep all confidential information so marked received in accordance with this Agreement in confidence for the term of this Agreement.

## Section 8.6: Governing Law

This Agreement shall be interpreted in accordance with, and governed, by the laws of the Commonwealth of Massachusetts.

## Section 8.7: Mutual Releases; Non-Disparagement

Etonic and Company hereby release each other of and from all claims and causes of action that were ever brought or could have been brought under any previous license agreement between them, provided that (a) Etonic does not waive and expressly reserves (1) all claims thereunder for royalties (which term shall include the one percent (1%) marketing fee up to the Effective Date) and (2) all claims thereunder for indemnification on account of third party claims; and (b) the Company does not waive and expressly reserves all trademark infringement claims against Etonic (1) on account of the Company's prior use of the Trademark; and (2) on account of the Company's use of the Trans Am logo.

Neither party hereto shall disparage the other party or its officers or products.

## Section 8.8: Captions

The captions of the Articles and Sections of this Agreement are for general information and reference only, and this Agreement shall not be construed by reference to such captions.

## Section 8.9: Independent Parties

Nothing contained in this Agreement shall be construed to place the parties in the relationship of legal representatives, partners or joint ventures. Neither Etonic nor Company shall have any power to obligate or bind the other in any manner whatsoever, other than as per this Agreement.

## Section 8.10: Costs and Expenses

In the event Etonic brings an action to enforce any provision of this Agreement, Company shall reimburse it for the cost and expense of such action, including Etonic's attorney's fees. In addition, in the event any amounts due Etonic under this Agreement including, without limitation, royalties, are not paid when due, then Company will also pay Etonic interest from the date originally due at the rate of one and one-half percent (1-1/2%) per month or the highest lawful rate, whichever is lower.

## Section 8.11: Severance

If any provision of this Agreement is held unenforceable for any reason, the remainder shall nevertheless remain in full force and effect. If such provision is held unenforceable due to its scope or breadth, then it shall be narrowed and enforced to the scope or breadth permitted by law.

## Section 8.12: Survival

Those provisions of this Agreement that are intended to remain in effect despite expiration or

termination including, without limitation, Sections 4.1, 4.2, 4.3, 5.1, 6.2, 6.3, 6.5, 6.6, 7.1, 7.2, 8.1, 8.2, 8.5, 8.7, 8.10, 8.13 and 8.14, shall survive such expiration or termination.

Section 8.13: Other

Company hereby waives and releases Etonic from any liability or claim resulting from or in any way relating to either Company's dealings or relationships with its suppliers of, or customers for Articles, or relating to the Articles themselves, including but not limited to delays or failure of delivery,: defective or incorrect merchandise, and payment or collection matters.

Company's obligations to Etonic under this Agreement are unconditional, notwithstanding any claim or controversy which may arise.

Company hereby waives and releases Etonic from any liability or claim resulting from the termination of or expiration of this Agreement in accordance with the provisions of the Agreement.

Time shall be of the essence with respect to all of Company's obligations and duties, all of which shall be performed and honored strictly in accordance with the terms of this Agreement notwithstanding any prior, continuing or subsequent course of dealing, custom, or usage in trade. Company acknowledges and irrevocably agrees that its failure to utilize the Trademark strictly in accordance with the terms of this Agreement, and to cease the manufacture, sale and distribution of Articles, advertising material or the Trademark at the termination or expiration of this Agreement, or its failure to comply with any other material provisions of this Agreement including, without limitation, the confidentiality and nondisclosure provisions of section 8.13 below, will result in immediate and irreparable damages to Etonic and to the rights of any subsequent licensee. Company acknowledges and admits that there is no adequate remedy at law for such failure or breach; and that in the event of such failure or breach, Etonic shall be entitled to seek equitable relief by way of temporary and permanent injunctions, and such other further relief as any court with jurisdiction may deem just and proper.

Unless otherwise mutually agreed in writing, no departure from, waiver of, omission to require compliance with any of the terms hereof, approval or non-approval shall be deemed to authorize any other prior or subsequent departure, waiver, omission, approval or non-approval, as the case may be.

This Agreement may not be modified orally, and no modifications or any claimed waiver of any of the provisions hereof shall be binding unless in writing and signed by the party against whom such modification or waiver is sought. With respect to any modification specifically requested by Company, Company shall pay Etonic an administrative charge as determined by Etonic and which shall reflect the internal costs necessary to complete any such modification, but which, in no event, shall be less than $3,000, or more than $6,000.

This Agreement constitutes the entire agreement between the parties and supersedes all prior contracts, agreements, and understandings between the parties relating to the subject matter hereof.

Section 8.14: Use of Certain Information and Materials

Etonic and Company acknowledge that certain information and materials owned by Etonic such as:

(a)     lasts, molds, dies, designs, patterns, models, samples and prototypes pertaining to Etonic athletic shoes;

(b)     business records pertaining to Etonic's former Etonic athletic shoe division;

14

(c)      customer and supplier lists pertaining to Etonic's former Etonic athletic shoe division;

(d)      advertising, sales and marketing materials pertaining to Etonic athletic shoes; and work product with respect to current and past sales, marketing and product research and development effort pertaining to Etonic athletic shoes, will facilitate Company's performance of its duties and obligations hereunder. Etonic agrees to permit Company to use such information and materials during the Term of this Agreement. In return, Company agrees to keep all such information and materials strictly secret and confidential and to refrain from disclosing them to any person or entity, other than Company's employees on a "need to know" basis, without first obtaining Etonic's written permission in each instance. Upon the expiration or other termination of this Agreement, Company will return all of such information and materials to Etonic.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the date first written above.


ETONIC WORLDWIDE LLC

By _____

Title _____



KINETIC SPORTS, INC.

By _____

Title _____

15

EXHIBIT "A"

1. **Etonic**®



2. **Etonic**®

3.  **Etonic**

4. **DRx**®

5. **Etonic**

6. **Stabilite**

7. **Stable Air**

16

EXHIBIT "B"

Dated _____

To Whom It May Concern:

This letter will serve as notice to you that pursuant to the License Agreement dated June ____, 2004 between Etonic Worldwide LLC and Kinetic Sports, Inc. ("Company"), we have been engaged as the manufacturer for the Company in connection with the manufacture of the Articles as defined in the aforesaid License Agreement. We hereby acknowledge that we have received a copy of the quality, trademark notice, and other relevant terms and conditions set forth in said License Agreement which are applicable to our function as manufacturer of the Article(s), and we agree to dispose of the Articles only to the above company. It is understood that this engagement is on a royalty free basis.

Sincerely,

_____

Name:

Title:

Company:

EXHIBIT "C"

Royalty Rates (Section 4.1)

5% of net sales

Minimum Royalty Payments (Section 4.2)

| Contract Quarter | U.S. Dollars | |
|---|---|---|
| April 1, 2004 to June 30, 2004 | 112,500 | Already paid as of the Effective Date |
| July 1, 2004 to September 30, 2004 | 112,500 | |
| October 1, 2004 to December 31, 2004 | 112,500 | |
| January 1, 2005 to March 31, 2005 | 125,000 | |
| April 1, 2005 to June 30, 2005 | 125,000 | |
| July 1, 2005 to September 30, 2005 | 125,000 | |
| October 1, 2005 to December 31, 2005 | 125,000 | |

18

EXHIBIT "D"

## ROYALTY PAYMENT SCHEDULE (Section 4.1)

| Shipment Period | Due Date | |
|---|---|---|
| April 1, 2004 to June 30, 2004 | July 25, 2004 | |
| July 1, 2004 to September 30, 2004 | October 25, 2004 | |
| October 1, 2004 to December 31, 2004 | December 24, 2004 | Prepay estimate, adjust to actual on January 25, 2005 |
| January 1, 2005 to March 31, 2005 | April 25, 2005 | |
| April 1, 2005 to June 30, 2005 | July 25, 2005 | |
| July 1, 2005 to September 30, 2005 | October 25, 2005 | |
| October 1, 2005 to December 31, 2005 | December 24, 2005 | Prepay estimate, adjust to actual on January 25, 2006 |

## MINIMUM ROYALTY GUARANTEE PAYMENT SCHEDULE (Section 4.2)

| Period Covered | Amount | Due Date |
|---|---|---|
| April 1, 2004 to June 30, 2004 | 112,500 | Already paid as of the Effective Date |
| July 1, 2004 to September 30, 2004 | 112,500 | July 25, 2004 |
| October 1, 2004 to December 31, 2004 | 112,500 | October 25, 2004 |
| January 1, 2005 to March 31, 2005 | 125,000 | January 25, 2005 |
| April 1, 2005 to June 30, 2005 | 125,000 | April 25, 2005 |
| July 1, 2005 to September 30, 2005 | 125,000 | July 25, 2005 |
| October 1, 2005 to December 31, 2005 | 125,000 | October 25, 2005 |

19

EXHIBIT "E"

**ETONIC LICENSED PRODUCTS
MARKETING OUTLINE**

Total document can be from 2 to 10 pages; whatever you feel is required.

I.    MARKET SIZE AND TRENDS
      Wholesale sales estimate by major product class and any relevant notes on growth, product,
      distribution, or other trends. Also a recap of major market opportunities.

II.   MAJOR COMPETITORS
      A description of the top three competitors and their market shares

III.  ETONIC POSITION
      Recap of sales history, market share competitive advantages, strengths, weaknesses, etc.

IV.   ETONIC STRATEGY
      Major strategies to continue growth, attack competition, or exploit market opportunities

V.    PRODUCT ARRAY
      Recap of major products offered plus a brief description.

VI.   TRADE CHANNEL DEFINITION
      Where will the product be sold.

VII.  SALES STRUCTURE
      Who will sell it.

VIII. RETAIL PRICE TARGETS
      By product type

IX.   MARKETING ELEMENT DESCRIPTION AND EXPENSE BUDGET
      - Catalogs/Price Lists
      - Shows
      - Advertising
      - Promotions
      - Display Materials
      - Research
      - Public Relations
      - Endorsements/Athletes Using Products

X.    SALES GOALS BY PRODUCT CLASS AND BY DISTRIBUTION CHANNEL

EXHIBIT "F"

## MONTHLY SALES FORECAST

### CURRENT 12 MONTH PERIOD

PERIOD COVERED: _____

LICENSEE: _____

CATEGORY: _____

| | |
|---|---|
| JANUARY | |
| FEBRUARY | |
| MARCH | |
| APRIL | |
| MAY | |
| JUNE | |
| JULY | |
| AUGUST | |
| SEPTEMBER | |
| OCTOBER | |
| NOVEMBER | |
| DECEMBER | |
| | |
| TOTAL 12 MONTH PERIOD | |

NOTE:     SHOULD YOU HAVE MORE THAN ONE LICENSE AGREEMENT OR
CATEGORY MINIMUM WITH ETONIC, THEN SEPARATE SALES ESTIMATE
FORMS MUST BE SEPARATED FOR EACH LICENSE AGREEMENT OR
CATEGORY MINIMUM.

FAX ABOVE TO BRIAN PRICE AT 781-891-1919 BY THE 5TH WORKING DAY OF
EACH MONTH.

21