<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ETONIC WORLDWIDE, LLC, | : | |
| | : | |
| Plaintiff, | : | Civ. No. 05-4004 (GEB) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| KINETIC SPORTS, INC., and | : | |
| IN STRIDE SHOES, LLC, | : | |
| | : | |
| Defendants. | : | |

<u>BROWN, District Judge</u>

This matter comes before the Court upon plaintiff Etonic Worldwide, LLC's ("Etonic" or "Plaintiff") motion for preliminary injunction against defendants Kinetic Sports, Inc. ("Kinetic") and In Stride Shoes, LLC ("In Stride") (collectively "Defendants"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332 and 1338. The Court, having considered the parties' submissions, as well as testimony given during five (5) days of hearings and the post-hearing submissions of both parties, and for the reasons set forth below, will grant Etonic's motion for a preliminary injunction against Kinetic, and will deny Etonic's motion for a preliminary injunction against In Stride.

## I.     BACKGROUND

On August 15, 2005, Etonic filed a complaint in this action seeking injunctive and monetary relief for Kinetic's alleged breach of contract, trademark infringement, trademark dilution and unfair competition. Etonic also seeks injunctive and monetary relief against In Stride for its alleged trademark infringement, trademark dilution and unfair competition. On the same day that it filed its complaint, Etonic filed its motion seeking preliminary injunction against the Defendants. This Court held an evidentiary hearing for purposes of the instant motion on

September 6, 7, 19, 20 and 21.

## II.   FINDINGS OF FACT

### A.   The Parties

Etonic, a Delaware corporation with its principal place of business in Massachusetts, is in the business of selling performance athletic shoes, golf shoes and bowling shoes.  Compl. ¶2; Seeman Aff. ¶2.  In addition, Etonic sells orthopedic shoes under its DRx label to consumers suffering from various foot ailments.  D. Werremeyer Aff. ¶5; Gazi Aff. Ex. A.  The Etonic brand was created in 1876 and is well recognized in the footwear industry.  Seeman Aff. ¶2.  Etonic owns various registered trademarks related to its brand (collectively "Etonic Trademarks").  *Id.*  The Etonic Trademarks were previously owned by Spalding, but were sold to Etonic in April 2003, which purchased the marks in large part for the name recognition of the Etonic brand.  9/6/05 Tr. at 23, 26.  Thomas Seeman is Etonic's Chief Executive Officer.  Seeman Aff. ¶2.

Kinetic, a New Jersey corporation with its principal place of business in New Jersey, is also in the performance athletic shoe business.  Compl. ¶3.  Before Etonic purchased the Etonic Trademarks, Kinetic had licensed the marks from Spalding and designed and manufactured shoes using those marks.  9/6/05 Tr. at 25.  After Etonic purchased the Etonic Trademarks, Kinetic continued to license those marks from Etonic pursuant to the terms of its original agreement with Spalding ("Old Agreement").  *Id.*  Daniel Werremeyer, Jr. is Kinetic's President and a minority shareholder in the company.  D. Werremeyer Aff. ¶1.

In Stride, a Delaware company with its principal place of business in New Jersey, is in the orthopedic shoe business.  Compl. ¶4; E. Werremeyer Aff. ¶16.  Its customers consist of medical, pharmaceutical and orthopedic institutions that serve patients who are diabetic and eligible for Medicare benefits.  E. Werremeyer Aff. ¶¶12-13.  Erica Werremeyer is In Stride's President and majority shareholder.  E. Werremeyer Aff. ¶¶6-7.  In the course of operating In Stride, Mrs.

2

Werremeyer occasionally consults her husband, Mr. Werremeyer, for his advice and assistance with respect to the shoe industry.  9/20/05 Tr. at 39, 48.

###    B.    Kinetic and Etonic's Licensing Relationship

In or about May 2004, Etonic and Kinetic engaged in litigation in the Superior Court of New Jersey based on the parties' dispute concerning the Old Agreement.  The case was removed to this Court on or about June 1, 2004.  On or about June 16, 2004, Etonic and Kinetic reached a settlement that involved entering a new licensing agreement ("Agreement").  Seeman Aff. Ex. 1. Pursuant to the terms of the Agreement, Kinetic continued to license the Etonic Trademarks, but under renegotiated conditions.  *Id.*

Despite the renegotiated Agreement and the end of the prior litigation, Etonic and Kinetic's relationship soured once again.  On July 21, 2005, Etonic sent a memorandum to Kinetic alleging various breaches of the Agreement on the part of Kinetic.  Seeman Aff. ¶ 24, Ex. 8.  Of particular concern to Etonic was Kinetic's sale of Etonic-branded shoes to Costco.  *Id.*  On or about August 5, 2005, Mr. Seeman met with Mr. Werremeyer during the World Shoe Association ("WSA") trade show in Las Vegas to discuss the situation.  Addendum to Seeman Aff. ¶4.  During that meeting, Mr. Seeman told Mr. Werremeyer that Kinetic was not allowed to sell Etonic shoes to Costco because it was a discounter, and the Agreement prohibited sales to discounters.  *Id.*  In response, Mr. Werremeyer expressed his belief that Costco did not constitute a discounter under the Agreement and indicated that Kinetic would continue selling to Costco. *Id.*  Mr. Werremeyer further told Mr. Seeman that he would continue seeking sales to Costco and other customers until June 30, 2006, or six months after the expiration date of the License Agreement, based on Kinetic's interpretation of its rights under the Agreement.  *Id.*

A week after the WSA meeting, Etonic sent a letter to Kinetic terminating the Agreement based on Kinetic's alleged breaches of contract.  Seeman Aff. Ex. 3.  The letter outlined seventeen (17) breaches, including Kinetic's alleged:  (1) sales to discount stores; (2) failure to

3

request Etonic's approval for several types of shoes displaying the Etonic mark; (3) failure to provide Etonic with written specifications for each Etonic shoe that it sells; (4) use of the Etonic Trademarks in conjunction with the sale of In Stride shoes; (5) use of the same or confusingly similar molds and patterns in making In Stride shoes; (6) selling In Stride shoes in competition with Etonic; (7) disclosure of the December 31, 2005 termination date of the Agreement; (8) use of unapproved versions of the Etonic Trademarks; (9) failure to purchase the required insurance coverage; (10) failure to permit Etonic representatives to participate in sales calls; (11) failure to provide Etonic with an up-to-date marketing plan; (12) poor customer service; (13) failure to submit advertising, packaging and labeling materials to Etonic for approval; (14) sale of Etonic shoes through the Internet without approval; (15) failure to provide Etonic an audited report of its sales of Etonic shoes; (16) failure to maintain high quality standards for Etonic shoes; and (17) disparagement of Etonic to Kinetic's employees.  *Id.*

Etonic's numerous claims of breach against Kinetic are based on several categories of alleged actions and omissions by Kinetic.  Primarily, they concern:  (1) Kinetic's sale of Etonic-branded shoes to Costco; (2) conduct by Kinetic suggesting that it competes with Etonic through its relationship with In Stride; and (3) various alleged omissions or failures by Kinetic in its use of the Etonic Trademarks.


### C.    Kinetic's Sales to Costco

Kinetic has sold a significant number of Etonic shoes to Costco over the course of its Agreement with Etonic.  During the first quarter of 2005, Kinetic sold approximately $2.5 million worth of Etonic shoes (in wholesale prices) to Costco.  Seeman Aff. Ex. 6.  During that same quarter, Kinetic's total shoe sales were approximately $4.2 million.  9/21/05 Tr. at 92.

In particular, Kinetic has sold to Costco an Etonic-branded shoe called the Excel.  The Excel is what is known in the shoe industry as a special make-up ("SMU") shoe.  SMU shoes are modified and less expensive versions of existing styles that are altered specifically for large

4

retailers.  9/6/05 Tr. at 46-47; 9/21/05 Tr. at 77-78.  The Excel is an SMU version of the popular Etonic Street Fighter shoe.  9/21/05 Tr. at 58-59.  For both the men's and women's versions, the upper portion of the Excel is identical to that of the Street Fighter, while the bottom portion appears to be a similar but less expensive version.  Pl. Exs. 4, 6, 24.

In addition to the Excel, Kinetic has designed an Etonic-branded shoe called the Element.  The Element is an SMU version of Etonic's Hybrid shoe, which Kinetic designed for Etonic earlier this year.  Seeman Aff. ¶180.  The Element consists of the same upper portion as that of the Hybrid, while the bottom is different and appears to be less expensive.  9/6/05 Tr. at 45; Seeman Aff. Exs. 30, 68.  Kinetic plans to sell the Element to Costco as well, although it has not begun manufacturing the shoe.  9/21/05 Tr. at 47, 49.

Etonic alleges that it has not approved the sale of the Excel and Element shoes, and that the sale of those shoes would hurt sales of the Street Fighter and Hybrid, respectively.  Etonic further alleges that sales to Costco in particular hurts the Etonic brand more generally.  Pl. Ex. 16.  Etonic is pursuing a strategy of targeting the higher-end athletic shoe market, specifically by selling to independent technical running stores.  Consistent with this strategy, Etonic is developing a line of high-end technical running shoes, including a design for a new shoe called the Jepara, which Etonic plans to sell primarily to such stores.  9/21/05 Tr. at 93.  According to Etonic, sale of SMU shoes to Costco has a negative effect on the reputation that Etonic is cultivating and diminishes its ability to sell in the higher-end market.  9/7/05 Tr. at 61-62; Seeman Aff. ¶40.

**D.     Kinetic's Relationship with In Stride**

Kinetic and In Stride's businesses overlap in several respects.  First, both Mr. and Mrs. Werremeyer are presidents of their respective shoe companies, and Mrs. Werremeyer occasionally draws on Mr. Werremeyer's experience in the course of her business.  9/19/05 Tr. at 47; 9/20/05 Tr. at 39, 48.  Second, a number of their employees work as independent sales staff

for both companies.  E. Werremeyer Aff. ¶31.  Included among them are Justin Gazi, who heads the marketing aspects of both companies, and Keith Miller, a public relations consultant.  Gazi Aff. ¶1; 9/20/05 Tr. at 75.

In addition, there is evidence that Kinetic has actively promoted In Stride's brand to Etonic customers.  In April 2005, Mr. Werremeyer instructed Kevin Leonard, formerly the National Sales Manager for Kinetic but currently an Etonic employee, to show In Stride shoes to Foot Solutions, an Etonic customer, during a business visit to Foot Solutions stores concerning Etonic shoes.  9/21/05 Tr. at 82-83, 98-100, 112.  In that same conversation, Mr. Werremeyer instructed Mr. Leonard to "leverage" the Etonic brand in showing the In Stride shoes.  *Id.* at 99-101.

On or about May 10, 2005, Messrs. Leonard, Gazi and Werremeyer attended meetings with Foot Solutions and Benchmark Brands, also an Etonic customer.  9/21/05 Tr. at 65-66.  At the meetings, the customers were shown two shoes bearing the In Stride trademark, namely the In Stride Malibu and In Stride Venice.  9/21/05 Tr. at 103-105; 9/20/05 Tr. at 25.  Also in or about May 2005, Mr. Leonard showed the Malibu and Venice shoes to an Etonic customer in Salt Lake City.  9/21/05 Tr. at 106-107.

### E.      In Stride's Alleged Trademark Violations

Etonic's trademark claims against In Stride are based on three shoes in particular, namely, In Stride's Malibu, Venice and Sojourn shoes.  Pl. Exs. 8, 12; Seeman Aff. Ex. 53.

Etonic claims that In Stride's Malibu is an impermissible replica of its Essence shoe. Two prototypes of the Malibu were entered into evidence.  The first prototype of the Malibu is virtually identical to the Essence.  Pl. Exs. 7, 8.  The only differences are that the toe area of the first Malibu prototype is higher and more square than that of the Essence, and the prototype does not bear Etonic marks.  The second Malibu prototype is more distinguishable than the first prototype and is observably different from the Etonic Essence.  Pl. Ex. 21.  In Stride claims that

production of the Malibu shoe will be based on the second, distinguishable prototype.  E. Werremeyer Aff. ¶62.

As for In Stride's Venice shoe, Etonic claims that it is an impermissible replica of the Etonic Trieste.  Other than differences in labeling and the material used, the design of the Venice is identical to that of the Trieste.  Pl. Exs. 11, 12.

It appears that In Stride produced its Venice shoe and the first Malibu prototype using the same molds that Etonic used for its Trieste and Essence shoes, respectively.  Gazi Aff. at ¶2. Although the In Stride shoes did not display Etonic marks, those marks were originally on the bottoms of the In Stride shoes but were then scraped off.  9/20/05 Tr. at 26-28.  In addition, the In Stride Venice and the first Malibu prototype both had the same insert as that used in the Etonic Trieste and Essence shoes, which insert contained a small cursive "e" logo that is visible upon their removal from the shoes.  Pl. Exs. 7, 8, 11, 12.

The resemblance of the In Stride shoes to the Etonic shoes was acknowledged by Mrs. Werremeyer herself.  In a product data sheet, she labeled the In Stride Malibu shoe as "Malibu (know [sic] as Essence)."  Seeman Aff. Exs. 47-48.  In labeling the Venice in another product data sheet, she wrote "Venice (know [sic] as Trieste)."  Seeman Aff. Ex. 49-50.

In addition to the In Stride Malibu and Venice shoes, Etonic claims that the In Stride Sojourn is a copy of the Etonic Sojourn shoe.  The Etonic Sojourn was a shoe that Kinetic designed for Etonic.  The Etonic Sojourn is a leather casual walking shoe that was available in black and brown colors, and with either shoelaces or a velcro strap.  Seeman Aff. Ex. 54.  Etonic requested that Kinetic stop making the shoe, however, because the Sojourn's style did not promote Etonic's brand image of designing performance athletic shoes.  E. Werremeyer Aff. Ex. D.  Kinetic stopped producing the Etonic Sojourn in June 2004.  9/20/05 Tr. at 111.  However, Etonic agreed to allow Kinetic to sell the Etonic Sojourns remaining in its inventory, while Kinetic agreed not to continue producing the shoe.  9/7/05 Tr. at 26.

In its Spring 2005 catalog, In Stride advertised an identical shoe called the In Stride

Sojourn.  Like the Etonic Sojourn, the In Stride Sojourn is a leather casual walking shoe

available in brown or black, with shoelaces or a velcro strap.  Seeman Aff. Ex. 53.  Other than

differences in the labels, the In Stride Sojourn is identical in style to the Etonic Sojourn. Seeman

Aff. Exs. 53-55.  Indeed, the In Stride Sojourn shoes were made using the molds used for the

Etonic Sojourn.  E. Werremeyer Aff. ¶¶57-58.  As of September 2005, both the Etonic Sojourn

and In Stride Sojourn were available for purchase on the Internet.  Second Addendum to Seeman

Aff. ¶4.  In Stride still has a small inventory of its Sojourn shoes in warehouse storage.  9/20/05

Tr. at 45.

## III.   CONCLUSIONS OF LAW AND FURTHER FINDINGS OF FACT PURSUANT THERETO

### A.   Standard for Preliminary Injunction

In deciding whether to issue a preliminary injunction, a court must consider:  (1) the

likelihood that the moving party will succeed on the merits; (2) the extent to which the moving

party will suffer irreparable harm without injunctive relief; (3) the extent to which the

nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public

interest.  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,

290 F.3d 578, 586 (3d Cir. 2002); *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920

F.2d 187, 191-92 (3d Cir. 1990).  The court should grant the preliminary injunction only if there

is evidence sufficient to show that all four factors favor preliminary injunction.  *Am. Tel. & Tel.*

*Co. v. Winback Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994), *cert. denied*, 514

U.S. 1103 (1995).  The decision to grant or deny the motion lies within "the sound discretion of

the district judge, who must balance all of these factors in making a decision."  *Kershner v.*

*Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).  Injunctive relief is an extraordinary remedy

that should be granted only in limited circumstances.  *Frank's GMC Truck Center, Inc. v. Gen.*

*Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).  This is especially the case for preliminary

injunctions because at that early stage of the litigation, the factual record has not yet been fully

developed.  *Winback and Conserve Program, Inc.*, 42 F.3d at 1427.

Etonic seeks preliminary injunctive relief against Kinetic for its alleged breach of contract and trademark violations, and against In Stride for its alleged trademark violations.  The Court will consider the claims against each Defendant.

### B.      Preliminary Injunction Against Kinetic

### 1.      Likelihood that Etonic Will Succeed in Its Claims Against Kinetic

Etonic seeks a preliminary injunction against Kinetic's use of the Etonic Trademarks. Because Kinetic's rights to use those marks arise from the Agreement, Etonic must first demonstrate a reasonable probability of success in proving the termination of the Agreement.

### a.      Termination of the Agreement

The Agreement provides that "[t]his Agreement shall be interpreted in accordance with, and governed, by the laws of the Commonwealth of Massachusetts."  Agreement § 8.6.  "Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court." *Edmonds v. U.S.*, 642 F.2d 877, 881 (1st Cir. 1981) (citing *Freelander v. G & K Realty Corp.*, 258 N.E.2d 786 (1970)).  "In interpreting a contract, the court must 'give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible.'" *Brillante v. R.W. Granger & Sons, Inc.*, 772 N.E.2d 74, 79 (Mass. App. Ct. 2002) (quoting *Baybank Middlesex v. 1200 Beacon Props., Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991)).  In determining the parties' intentions, "a court considers the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances."  *Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers*, 577 N.E.2d 283, 288 (Mass. 1991).

Section 7.1 of the Agreement (entitled "Default and Termination") provides that the Agreement:

> may be terminated by either party upon default or breach of
> warranties of the other party, by giving said other party written

9

> notice of intention to so terminate, which notice shall specify the
> default or breach upon which the notifying party intends to rely,
> and such termination shall become effective thirty (30) days from
> the receipt of such notice provided such default or breach is not
> rectified by the notified party within that time or a time agreed
> upon by the parties in writing.

The section further provides that "[a]dditionally, three (3) or more rectified defaults and/or

breaches of the warranties of this Agreement by [Kinetic] during any twelve (12) month period

shall be grounds for immediate termination of this Agreement by Etonic."

To show that Kinetic's continued use of the Etonic mark warrants a preliminary

injunction, Etonic must first show a reasonable probability of success in proving that the

Agreement was properly terminated. Based on section 7.1 of the Agreement, such proof would

require a showing that Kinetic either continued to breach the contract after thirty (30) days of

receiving a notice of termination based on its breach, or committed three (3) separate breaches,

even if those breaches were subsequently rectified.

Etonic alleges seventeen (17) breaches of the Agreement by Kinetic. For purposes of the

instant motion, Etonic does not need to prove all seventeen breaches. Etonic may meet its

burden if it can demonstrate a reasonable probability of success in proving that Kinetic's

breaches, if any, permit the termination of the Agreement pursuant to section 7.1. Based on the

facts established through the submitted affidavits and exhibits, as well as the testimony provided

during five (5) days of hearings, the Court finds that Etonic satisfies its burden.

### (1)     Sales and Attempted Sales to Discount Stores

Etonic claims that Kinetic's sale of Etonic shoes to Costco violates section 5.3 of the

Agreement (entitled "Marketing"). That section states that Etonic and Kinetic:

> acknowledge that the following reflects their current mutual
> marketing and sales philosophies for Etonic branded products:
>
>     (a) Quality – [Kinetic] will maintain high quality standards
> for Etonic branded footwear and apparel.
>
>     (b) High Performance – [Kinetic] shall use its best efforts

10

to incorporate state-of-the-art high performance technical features and competitive designs in all Etonic branded footwear and apparel.

(c) Distribution – [Kinetic] will sell Etonic branded footwear and apparel only to such markets as will enhance the upscale image of the Trademark. [Kinetic] shall be in default if sales of the Articles are made to 'discounters', as that term is commonly understood by the parties as of the Effective Date.

Etonic argues that Costco constitutes a "discounter" under this provision, and that Kinetic's sales of Etonic shoes to Costco therefore breaches the Agreement. In support of its argument, Etonic refers to various publications that describe Costco as a discounter. Kinetic objects to the use of such articles as inadmissible hearsay. Without relying on those publications, however, it is apparent that Costco is a discounter for purposes of interpreting the Agreement. The *Dictionary of Retailing* defines "discount store" as:

A retail establishment which operates on low margins in order to offer merchandise at prices below the recognized market level. The discount store emphasizes self-service and generally charges for additional customer services. Typically volume oriented, it is distinguished primarily by its emphasis on price.

Seeman Aff. Ex. 10. Meanwhile, another industry reference guide, the *Dictionary of Retailing & Merchandising*, defines "discount store" and "discount house" as "a retail operation, usually a no-frills store, in which prices are lower than at other stores selling the same merchandise." Seeman Aff. Ex. 17.

The evidence shows that Etonic Costco is indeed a discounter. For example, Mr. Leonard credibly testified, based on his familiarity with the retail shoe business, that Costco is considered to be a discounter. 9/21/05 Tr. at 85-86. Moreover, the evidence concerning the profit margins for the Excel shoe further supports such a finding. Costco's profit margin for the Excel is lower than that of other retailers selling the Street Fighter. Kinetic sold the Excel to Costco at a price of approximately $19 a pair. 9/21/05 Tr. at 29. In July 2005, Etonic employees were able to purchase Excel shoes from Costco for $21.99 a pair. Seeman Aff. ¶ 20. In contrast, the wholesale price for the Street Fighter is approximately $40 per pair, and its retail price is

11

approximately $85 per pair.  Seeman Aff. ¶21; 9/21/05 Tr. at 29.  The difference between the retail and wholesale price of the Excel shoe for Costco is approximately $3, or 15.8% of the wholesale price.  The difference between the retail and wholesale price of the Street Fighter generally is $45, or 112.5% of the wholesale price.

Kinetic responds by citing a different definition for "discount stores," which describes the stores as "[r]etail establishments that meet the requirements of a department store, but have lower cost structures and typically sell at lower prices than conventional department stores."  Gazi Supplemental Aff. Ex. C.  The same dictionary includes Costco as an example of a "warehouse club[]", which it defines as "[s]elf-service establishments selling a variety of products, generally in bulk sizes[] [where] [m]embership fees are typically required."  *Id.*  According to Kinetic, because Costco is listed in the definition for warehouse club but not for discount store, it is properly defined as the former and not the latter.  Kinetic also argues that Costco is not a discounter because it sells various expensive brand name items.

Kinetic's arguments are not persuasive.  First, Kinetic provides no argument for finding that "discount store" and "warehouse club" are mutually exclusive terms.  Second, the fact that Costco was not included as an example of a discount store does not mean it does not fit the definition – otherwise, no stores other than the ones provided as examples would qualify as a discount store.  Third, it is irrelevant that Costco sells expensive brand name goods because even under Kinetic's preferred definition, a discounter is defined by its lower cost structure, and it is possible for such goods to be sold at lower cost at Costco than at other retailers.

Kinetic further attempts to justify its sale of Etonic shoes to Costco by describing it as a common and profitable business model.  9/7/05 Tr. at 123-25.  Kinetic also notes that Etonic itself sells to discounters with regard to its line of golf shoes.  9/7/05 Tr. at 135.  These arguments are also unpersuasive.  Regardless of the profitability of selling to discounters, pursuant to the terms of the Agreement, such sales are prohibited.  As for whether Etonic sells to discounters with respect to its other lines of shoes, any such sales would not affect Etonic's rights

12

as defined by the Agreement, which concerns only the shoes that Kinetic manufactures.

### (2) Failure to Seek Etonic's Approval for New Shoes

Section 6.1 of the Agreement (entitled "Licensed Articles Approval") states that Kinetic "shall promptly submit to Etonic's representative first run specimens of each Article on which the Trademark is used, together with written specifications for each article in a form satisfactory to Etonic, and a written request for approval of the specimen and specifications."

Kinetic did not seek or receive Etonic's approval for the design of the Excel shoe prior to selling the shoe to Costco.  Seeman Aff. ¶50; 9/21/05 Tr. at 54-59.  There is no dispute that the Excel is a design based on a style that Etonic did approve, namely the Street Fighter.  Mr. Werremeyer defends Kinetic's sale of the Excel by saying that "[t]he 'Excel' is a shoe that was previously approved by [Etonic] known as the 'Street Fighter' but has simply changed names."  D. Werremeyer Aff. ¶37.  The Court finds that the Excel is different from the Street Fighter in several material respects, including the name, the bottom and the cost of manufacture of the shoes.  These deviations required Etonic's separate approval of the Excel before Kinetic could sell that shoe.  Etonic sent its termination letter to Kinetic on or about August 12, 2005.  As of that date, Kinetic had not sought nor received approval of the Excel shoe.

Furthermore, although Kinetic denies its failure to submit the Excel to Etonic for approval, the denial is not credible.  It has provided no evidence that it sent the Excel shoe to Etonic prior to its sale to Costco, only speculation.  9/21/05 Tr. at 54.

It also appears that Kinetic did not seek or receive approval for the Element, a shoe that is virtually identical to but less expensive than the Etonic Hybrid.  Kinetic argues that it was not required to show Etonic the Element because "first run" means the first example of a produced line of shoes rather than a prototype, and Kinetic has yet to manufacture or sell the Element shoe.  However, Kinetic does not provide any support for such an interpretation.  The language of the provision shows that its purpose is to require Etonic's "approval of the specimen and

specifications."  The logical reading of the language is that Etonic must approve the specimen before the shoes are manufactured, rather than after the costs of manufacture have been incurred.

Based on these facts, Etonic has demonstrated a reasonable probability of success in proving that Kinetic failed to promptly submit samples of the Excel and Element shoes for Etonic's approval.

### (3)      Failure to Provide Written Specifications

Etonic alleges that Kinetic failed to provide written specifications for a number of Etonic shoes in violation of section 6.1 of the Agreement.  For the reasons already described, Etonic has sufficiently demonstrated that Kinetic failed to promptly provide such specifications with respect to the Excel and Element shoes.

As for Etonic's allegations concerning Kinetic's failure to submit specifications for numerous other shoes, those claims are unsubstantiated by the current record.  On or about August 9, 2005, pursuant to Mr. Werremeyer and Mr. Seeman's discussion on or about August 5, 2005, Kinetic sent a number of samples and specifications for a number of SMU samples, to which Etonic has not yet responded.  D. Werremeyer Aff. ¶34.  Moreover, Mr. Seeman testified that he was unsure what specifications had been sent by Kinetic.

### (4)      Use of the Etonic Trademark in Conjunction with In Stride's Brand

Etonic claims that Kinetic used the Etonic trademark in conjunction with In Stride's brand in violation of section 6.5 of the Agreement (entitled "Other Trademarks").  Section 6.5 provides that "[Kinetic] shall not place or use other trademarks, tradenames, designs, logos or endorsements in conjunction with the Articles, except as specifically authorized by Etonic in writing before the commencement of such use."  Etonic bases its claim on two specific events.

First, Mitrac, a footwear company, printed a catalog that prominently advertised on its cover page "Etonic DRx" shoes and advertised two In Stride shoes.  Seeman Aff. Ex. 44.

14

Second, ComfortFit Orthotic Labs labeled certain of In Stride's shoes as "Etonic In Stride" on its website.  Seeman Aff. Ex. 40.  However, the current record does not establish that the association between Etonic and In Stride in these advertisements resulted from Kinetic's own actions.  9/7/05 Tr. at 28-29, 33-34.  For this reason, Etonic fails its burden with respect to these claims.

### (5)   Use of Etonic Molds and Patterns in Making In Stride Shoes

Section 5.1 of the Agreement (entitled "Company Relationships") states that Kinetic "shall not replicate patterns or molds used for or are confusingly similar to any Articles."  It appears that the molds used to make the Etonic Essence, Trieste and Sojourn were used to make the In Stride Malibu, Venice and Sojourn shoes, respectively.  However, Etonic has failed to prove that Kinetic was responsible for the use of the same molds for In Stride's shoes.  Based on the current record, Etonic fails to satisfy its burden with respect to these claims.

### (6)   Sale of In Stride Shoes in Competition with Etonic

Section 5.1 of the Agreement further provides that:

> [Kinetic] and Etonic may secure other licenses for competitive products and may engage either directly or indirectly in the research, design, development, marketing, advertising, promoting, merchandising, shipping, distributing, or selling of any performance footwear products except, however, that they may not offer such products for sale prior to June 1, 2005, and neither party shall ship such products until January 1, 2006 . . . .

The record shows that prior to June 1, 2005, Kinetic sales staff showed In Stride shoes that were virtually identical to Etonic shoes during meetings with Etonic customers.  Mr. Werremeyer instructed Mr. Leonard to show In Stride shoes to Foot Solutions stores in April 2005.  Mr. Werremeyer instructed him to do the same when Mr. Leonard met with an Etonic client in Salt Lake City in May 2005.  At the meetings that Messrs. Werremeyer, Leonard and Gazi attended together on or about May 10, 2005, In Stride shoes were displayed to Foot Solutions and Benchmark Brands, both Etonic customers.  Etonic has shown a reasonable probability of

success on this claim.

### (7)     Disclosure of the December 31, 2005 Termination of the Agreement

Section 5.1 of the Agreement also provides that:

> Etonic and [Kinetic] acknowledge that they are entering into this License Agreement pursuant to and in accordance with their settlement . . . [and] agree to keep the terms of the settlement of the Lawsuit confidential from customers and salespeople until June 1, 2005, but may state that the matter has been settled.

According to Mr. Leonard, during the meetings that he attended with Etonic customers Foot Solutions and Benchmark Brands in May 2005, Mr. Werremeyer disclosed that the Agreement would be terminated.  9/21/05 Tr. at 103-104.  Mr. Werremeyer admitted that he told Kinetic's sales staff that the Agreement with Etonic would be ending before June 1, 2005.  9/21/05 Tr. at 74.  The Court finds this testimony to be credible, and Kinetic has provided no credible evidence to the contrary.  Etonic has therefore demonstrated a reasonable probability of success with respect to this claim.

### (8)     Use of Unapproved Versions of the Etonic Trademark

Section 6.3 of the Agreement (entitled "Registration and Protection of Trademark") provides that "[e]xcept as otherwise agreed in writing, in no event shall [Kinetic] deviate in any manner in its use of the Trademark from the form of the Trademark set forth in the attached Exhibit A."  Specifically, Etonic alleges that Kinetic's use of the cursive small "e" as a logo violates the Agreement.  9/19/05 Tr. at 116-119; Seeman Aff. Ex. 68.  Although the logo is not listed in Exhibit A of the Agreement and Etonic explicitly instructed Kinetic not to continue its use, there is dispute concerning whether Etonic knew of and permitted the use of the logo for some period of time, and whether Kinetic continued to use the logo after Etonic instructed it not to do so.  Etonic therefore fails its burden with respect to this claim based on the current record.

**(9)      Failure to Purchase the Required Insurance Coverage**

Etonic broadly alleges that Kinetic failed to maintain insurance coverage as required by section 8.2 of the Agreement (entitled "Insurance").  Kinetic has provided evidence that it maintained insurance coverage for the period of May 17, 2005 through May 17, 2006.  Def. Ex. 43.  Without more specific facts concerning Kinetic's alleged deficiency, Etonic fails its burden with respect to this claim.

**(10)     Failure to Allow Etonic Representatives to Participate in Sales Calls**

Section 5.1 of the Agreement provides that "[a]s of the Effective Date Etonic may participate in sales calls with customers."  Specifically, Etonic alleges that on or about April 25, 2005, Gary Siriano, head of Etonic Running and Walking, emailed Mr. Werremeyer for the purpose of participating in Kinetic's sales calls.  Seeman Aff. Ex. 70.  The next day, Mr. Werremeyer responded to Mr. Siriano by informing him that all sales calls had been completed for the season, but that Kinetic would permit Etonic to attend calls in the future.  *Id.*  These facts alone do not indicate that Kinetic prevented or denied Etonic's participation in sales calls.  Etonic fails its burden with respect to this claim.

**(11)     Failure to Provide Etonic with a Marketing Plan**

Section 5.3 of the Agreement states that:

> No later than ninety (90) days after the date of this Agreement is signed by [Kinetic], and no later than ninety (90) days prior to each anniversary of the Effective Date of this Agreement, the [Kinetic] will provide Etonic . . . a written marketing plan and program for [Kinetic]'s activities with respect to each category of Articles in the Territory for the coming year in form, content, detail and substance acceptable to Etonic's sole discretion per the attached Exhibit 'E'.

Exhibit E provides an outline for the marketing plan and identifies the categories of information to be provided in the plan.  Included in the list of categories is "trade channel definition," or

where the product will be sold.

Kinetic has provided two marketing plans.  The first was sent on or about May 5, 2004 ("2004 Marketing Plan").  Seeman Aff. Ex. 71.  The second was sent on or about August 25, 2005 ("2005 Marketing Plan").  Gazi Supplemental Aff. ¶28; 9/19/05 Tr. at 121.  It appears that Kinetic violated section 5.3 with respect to both submissions.

The 2004 Marketing Plan did not include any description of Kinetic's plans to sell SMU shoes to Costco or Etonic shoes on the Internet.  Seeman Aff. Ex. 71.  According to Kinetic, Costco was not included in the 2004 Marketing Plan because at the time, Kinetic did not know that it would be selling to Costco.  9/21/05 Tr. at 62.  The Court does not find this explanation credible in light of the fact that sales to Costco constituted more than half of Kinetic's sales in the first quarter of 2005.

Moreover, even if Kinetic had not planned to sell to Costco at the time it submitted the 2004 Marketing Plan, Kinetic should have included that information in a timely marketing plan in 2005.  The Agreement requires submission of the marketing plan no later than ninety (90) days before the anniversary date of the Agreement.  The Agreement was signed on June 16, 2004.  Ninety days prior to the 2005 anniversary date would have been March 18, 2005, so that Kinetic's submission of its 2005 marketing plan was late.  Kinetic claims that its 2005 Marketing Plan was not late because the 2004 Marketing Plan covered an 18-month period between 2004 and 2005.  Seeman Aff. Ex. 71.  The 2004 Marketing Plan makes no indication that it was intended to be an 18-month plan.  For these reasons, Etonic satisfies its burden with respect to this alleged breach.

### (12)   Poor Customer Service

Etonic alleges that Kinetic provided poor customer service in violation of section 5.4 of the Agreement (entitled "Customer Service").  That section provides that "[Kinetic] agrees to use best efforts to continuously provide customer service on Etonic branded business at a high level

18

of quality . . . including . . . [c]ustomer service representatives whose function is to handle Etonic customer inquiries and who will consistently answer a minimum of ninety percent (90%) of customer/ consumer inquiries within five (5) working days of receipt . . . ."  Etonic claims that Kinetic violated this provision because it used a voicemail system to receive calls rather than live operators.  9/19/05 Tr. at 121-22; 9/20/05 Tr. at 98.  This fact alone does not show that Kinetic provided a deficient level of customer service.  Etonic therefore fails its burden with respect to this claim.

### (13)  Failure to Submit Advertising, Packaging and Labeling Materials to Etonic for Approval

Etonic broadly alleges that Kinetic failed to submit advertising, packaging and labeling materials for Etonic's approval based on section 6.2 of the Agreement (entitled "Advertising, Packaging and Labeling").  That section provides that:

> [Kinetic] shall submit in writing to Etonic or its authorized representative for its approval all advertising and packaging and other material prepared by or for it, during conceptual stages before the same is used, circulated or displayed. . . . The foregoing procedure shall also govern the approval of advertising, packaging, promotional and other graphic material to be utilized in customer cooperative advertising.

The record is currently unclear as to what specific types of advertising, packaging and labeling constitute the alleged violations of this section.  Etonic therefore fails its burden with respect to this claim.

### (14)  Sale of Etonic Shoes Through the Internet Without Approval

Section 6.8 of the Agreement (entitled "Internet Sales") provides that "[Kinetic] shall not advertise, market, promote or sell the Articles through the Internet or the World Wide Web without first obtaining the written approval of Etonic."  Etonic alleges that Kinetic sold shoes on the Internet in violation of the Agreement.  Although Etonic has proven that Etonic shoes were sold on the Internet, the current record is unclear as to whether this was the fault of Kinetic or its

19

customers.  Etonic therefore fails its burden with respect to this claim.

### (15)   Failure to Provide Etonic an Audited Sales Report

Section 4.3 of the Agreement (entitled "Royalty Records and Audits") provides that "[Kinetic] shall instruct its external auditors to remit to Etonic on a yearly basis, an audited report showing the sales and pertinent financial information referring to the licensed Articles . . . ." Etonic claims that Kinetic failed to provide an audited sales report for the year 2005 as required by section 4.3.  At the time of the preliminary injunction hearing, Kinetic had not yet provided an audited sales report to Etonic, although it had submitted materials to its accountant to prepare the report.  9/20/05 Tr. at 101.  Etonic has demonstrated a probability of success on this claim.

### (16)   Failure to Maintain High Quality Standards

Etonic claims that Kinetic produced Etonic shoes of poor quality in breach of section 5.3 of the Agreement, which provides that "[Kinetic] will maintain high quality standards for Etonic branded footwear and apparel."  Etonic bases its claim on:  (1) Kinetic's use of rented molds in manufacturing Etonic shoes; (2) the alleged return of Etonic shoes by Costco and Benchmark Brands; and (3) the misspelling of the Etonic mark "Stabilite."  None of these allegations support Etonic's claim.

First, although Kinetic has used rented molds to make Etonic shoes, there is no evidence that the use of such molds resulted in shoes of functionally lower quality.  Second, Etonic has failed to prove that the returns of its shoes were the result of their allegedly poor quality.  Etonic alleges that at one point, Benchmark Brands returned an order of a certain style of Etonic shoes because the shoes were a half-size too large, but it is not clear whether this was the fault of Kinetic or Benchmark Brands.  D. Werremeyer Aff. ¶82.  As for the alleged returns of Costco shoes, Etonic fails to describe those returns in sufficient detail, or demonstrate that the returns were the result of poor quality.  Finally, with respect to the misspelling of "Stabilite," it is unclear

20

whether Etonic permitted  the continued misspelling in subsequent shoes.  9/19/05 Tr. at 114-15.
Based on the current record, there is insufficient evidence to show a probability of success on this
claim.

### (17)    Disparagement of Etonic to Kinetic's Employees.

Etonic claims that Kinetic disparaged it in breach of section 8.7 of the Agreement
(entitled "Mutual Releases; Non-Disparagement").  That section provides that "[n]either party
hereto shall disparage the other party or its officers or products."  Etonic's allegations are largely
vague and unsubstantiated.  One specific example of the alleged disparagement is an email from
Mr. Werremeyer to Mr. Leonard with negative comments concerning Etonic.  Pl. Ex. 15; 9/7/05
at 49.  This fact, without more, does not constitute breach of the Agreement, and Etonic fails its
burden in this respect.

### (18)    Whether Etonic's Termination of the Agreement Was Proper

Based on the current record, it appears that Kinetic committed at least seven (7) distinct
breaches of the Agreement, including:  (1) selling the Excel shoe to a discounter; (2) failing to
seek approval for the Excel shoe; (3) failing to seek approval for the Element shoe; (4) selling In
Stride shoes in competition with Etonic; (5) prematurely disclosing the termination date of the
Agreement; (6) failing to promptly submit accurate marketing plans; and (7) failing to promptly
submit an audited sales report.  Therefore, Etonic has demonstrated a probability of success in
proving that it properly terminated the Agreement based on Kinetic's breaches.

### b.    In Stride as Kinetic's Alleged Alter Ego

Etonic also alleges that In Stride's conduct should constitute breach of the Agreement
based on the theory that In Stride is an alter ego to Kinetic.  "[A]lter ego liability may be
premised on some 'less precise notion that the [two distinct] corporations simply acted

21

interchangeably and in disregard of their corporate separateness.'" *United Food and Commercial Workers Union v. Fleming Foods East, Inc.*, 105 F. Supp. 2d 379, 389 (D.N.J. 2000) (quoting *Am. Bell, Inc. v. Fed'n of Tel. Workers of Pennsylvania*, 736 F.2d 879, 886-87 (3d Cir. 1984)). *See also My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748 (1968) (holding a corporation may be deemed the alter ego of another when there is active and direct participation by the representatives of one corporation exercising pervasive control in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship).

Several facts suggest a close relationship between In Stride and Kinetic.  Mr. and Mrs. Werremeyer are presidents of their respective shoe companies, and Mrs. Werremeyer occasionally consults her husband on matters relating to the shoe business.  Both share the same sales staff.  Kinetic has assisted In Stride in selling its comfort shoes to Etonic customers in apparent violation of its Agreement with Etonic.

But other facts suggest that Defendants do not have an alter ego relationship.  In Stride concentrates on orthopedic footwear, while Kinetic licenses and sells Etonic-branded athletic shoes.  In Stride operates as a legitimate business enterprise with different clients than Kinetic. In Stride's ownership structure is different from Kinetic's.  Mr. Schwartz, a minority owner in In Stride but not Kinetic, has testified to his contributions to In Stride's strategy and business, but is not involved in Kinetic's business.  9/19/05 Tr. at 23.  Moreover, Etonic has not demonstrated any level of control over Kinetic by In Stride, or vice versa.

Etonic points to the fact that Kinetic and In Stride had the same phone number listed in their registration for the 2005 WSA trade show.  Seeman Aff. Ex. 39; 9/20/05 Tr. at 20.  But given that Mr. Gazi was responsible for submitting the information, and that he was employed by both companies and could be reached at the contact information provided, this fact does not prove an alter ego relationship between Kinetic and In Stride.

Etonic also relies on In Stride's incorporation documents as evidence that it is Kinetic's alter ego because Mr. Werremeyer is listed as the president and his home address is provided.

9/20/05 Tr. at 51-52.  But Etonic has failed to provide evidence that Mr. Werremeyer exercises any formal or actual control over In Stride's business.  Furthermore, Mrs. Werremeyer has testified that she conducts In Stride business from the same home address.  Based on the current record, Etonic fails to show a likelihood of success in proving an alter ego relationship between the Defendants.

### c.    Trademark Claims Against Kinetic

Etonic seeks to prevent Kinetic's continued use of the Etonic trademark in light of its termination of the Agreement.  Section 32 of the Lanham Act ("Act") provides that:

> (1)  Any person who shall, without the consent of the registrant –
>
>   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
>   (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).  To prevail on an infringement claim under § 32 of the Act, a plaintiff must prove that:  (1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning their origin.  *Opticians Ass'n*, 920 F.2d at 192; *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001); *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000).

The Etonic trademark is a registered trademark owned by Etonic – there is no dispute

concerning the first and second requirements in finding trademark infringement.  As for whether Kinetic's continued use of the Etonic trademark is likely to confuse consumers and retailers, Etonic must show that "consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark."  *Checkpoint Sys.*, 269 F.3d at 280 (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978)).

The Third Circuit Court of Appeals requires consideration of ten (10) factors in determining the issue of confusion.  Those factors are:  (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).  The Third Circuit Court of Appeals has held that courts "'need rarely look beyond the mark itself'" in cases involving competing goods, although it recently recognized that "consideration of the *Lapp* factors . . . can be quite useful for determining likelihood of confusion even when the goods compete directly."  *KOS Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004) (quoting *A & H Sportswear*, 237 F.3d at 212).

In light of the fact that Kinetic seeks to continue selling Etonic-branded shoes, factors 1, 2, 3, 7, 8, 9 and 10 weigh in favor of Etonic.  The mark in question is the Etonic trademark itself.

24

The Etonic brand is a recognized mark in the athletic shoe industry, especially among Etonic's own customers.  Etonic's customers include retailers who have purchased Etonic shoes from Kinetic as an authorized licensee.  Kinetic would be selling through the same channels as used for authorized Etonic shoes.  Both Etonic and Kinetic would be targeting the same market, namely athletic shoe retailers, and selling performance athletic shoes.

Factors 4, 5 and 6 are not useful in this case given the parties' licensing relationship. There has been no actual confusion nor an intent by Kinetic to adopt the mark because the Agreement authorized Kinetic to sell Etonic shoes.

Without the licensing rights provided by the Agreement, Kinetic's continued use of the Etonic trademark would constitute infringement.  It is clear that a consumer purchasing shoes with the Etonic trademark would expect those shoes to be authorized by Etonic even if they are not.  In the case of an ex-licensee continuing use of the formerly licensed trademark, that continued but unauthorized use should be found to be confusing.  *See Ford Motor Co. v. A.C. Car Group Ltd.*, 2002 WL 1072258 (E.D. Mich. March 4, 2002) ("It is axiomatic that use of a licensed mark by an ex-licensee after termination of the license creates a likelihood of confusion, infringing and unfairly competing with the rights of the trademarke owner").

Because this Court finds that Etonic has demonstrated a probability of success in showing trademark infringement by Kinetic, there is no need to determine Etonic's additional trademark claims against Kinetic.

### 2.        Irreparable Injury to Etonic by Kinetic

To demonstrate irreparable injury, a plaintiff must claim an injury of a peculiar nature so that compensation in money alone cannot atone for it.  *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987).  Grounds for finding irreparable injury include likely confusion, loss of control of reputation, loss of trade and loss of good will.  *Opticians Ass'n*, 920 F.2d at 195-96; *Liquid Glass Enters., Inc. v. Dr. Ing. h.c.F. Porsche AG*, 8 F. Supp. 2d 398, 406 (D.N.J. 1998) (holding that

the unauthorized use of the mark at issue "inhibit[ed] Porsche's ability to control which products its reputation and good will are being used to promote or endorse[] [and such] lack of control and potential damage to Porsche's reputation constitutes irreparable injury because monetary damages cannot adequately compensate for harm to good will or reputation").

Etonic is attempting to bolster its brand in the performance athletic shoe market.  Its goal of improving Etonic's brand image is demonstrated by its current plans to introduce a higher-end line of shoes targeted at specialty running stores.  In pursuing its goal, it is important to Etonic to be able to control its brand and the goodwill it enjoys.  9/6/05 Tr. at 44.

Several provisions of the Agreement demonstrate Etonic's interest in maintaining control of its brand.  Section 5.3 ("Marketing") lists the three "marketing and sales philosophies" for Etonic shoes:  (1) quality; (2) high performance; and (3) distribution (specifically to "enhance the upscale image of the Trademark").  Section 6.1 ("Licensed Articles Approval") requires Kinetic to seek Etonic's approval of first run specimens of each shoe on which the Etonic trademark is used.  Section 6.2 ("Advertising, Packaging and Labeling") requires similar approval by Etonic for advertising and packaging materials used for Etonic shoes.  Section 6.6 ("Goodwill") acknowledges that Kinetic "recognizes the goodwill inherent in the Trademark and acknowledges that the goodwill attached thereto belongs to Etonic and that such Trademark has secondary meaning in the minds of the public."  Mr. Seeman has repeatedly testified that control of the Etonic brand is of great importance to the company.  9/6/05 Tr. at 31, 45-46.

The Agreement also explicitly recognizes the irreparable nature of any harm stemming from Kinetic's breaches.  Section 8.13 states that Kinetic "acknowledges and admits that there is no adequate remedy at law for [its] failure or breach [of its obligations pursuant to the Agreement]; and that in the event of such failure or breach, Etonic shall be entitled to seek equitable relief by way of temporary and permanent injunctions, and such other further relief as any court with jurisdiction may deem just and proper."  Moreover, there is credible testimony by both Mr. Seeman and Mr. Leonard that Etonic is concerned with its reputation in the athletic

26

shoe industry, and that injury to its reputation would adversely affect its current and future customer relationships.

Based on this record, it appears that Kinetic has repeatedly sought to impede Etonic's exercise of its right to control the Etonic Trademarks and brand. Allowing Kinetic to continue its use of Etonic's brand would result in Etonic's loss of control of its trademarks, and would likely damage the brand image that Etonic is seeking to maintain and promote.

### 3.     Irreparable Injury to Kinetic in Granting a Preliminary Injunction

"In deciding whether injunctive relief is appropriate, the third task a trial court must undertake is to balance the hardships to the respective parties." *Opticians Ass'n*, 920 F.2d at 197. "A basic purpose behind the balancing analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner." *Id.* Here, Kinetic would suffer serious injury if Etonic's motion for a preliminary injunction were granted. Its business is based on sales of Etonic shoes. It currently has up to three million dollars worth of Etonic inventory in production, although the precise amount has not been verified. It purportedly owes upwards of two million dollars to its creditors. However, for two reasons, the injury to Etonic in denying an injunction appears to outweigh Kinetic's injury as a result of its issuance.

First, a party "can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *KOS Pharms.*, 369 F.3d at 728 (quoting *Opticians Ass'n*, 920 F.2d at 197). "[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health*, 290 F.3d at 596. Kinetic cannot complain that it is no longer able to use the Etonic mark because of the termination of its license when the termination stemmed from its own actions in breach of the Agreement. *See Pappan Enters. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) ("any difficulties [plaintiff] now faces were brought on by its own conduct in continuing to use the [] marks despite the termination of the franchise agreements").

Second, if Kinetic were wrongfully enjoined from the manufacture and sale of Etonic shoes, it may seek recovery of its lost investment and profits against Etonic.  While an injunction against Kinetic would be a serious injury, it is not irreparable.  In contrast, Etonic's injury would be control of its brand, a much more difficult injury to quantify and remedy.

### 4.      Public Interest in Enjoining Kinetic

In a trademark case, the public interest is most often a synonym for the right of the public not to be deceived or confused.  *Opticians Ass'n*, 920 F.2d at 197-98.  Kinetic's unauthorized continued use of the Etonic trademark would confuse the public.  Etonic therefore satisfies this requirement for the preliminary injunction that it seeks.

### C.      Preliminary Injunction Against In Stride

### 1.      Likelihood that Etonic Will Succeed in Its Claims Against In Stride

Etonic claims that In Stride engaged in trademark infringement, unfair competition and trademark dilution.  The Court will consider the merits of each of Etonic's claims.

### a.      Trademark Infringement

To show trademark infringement by In Stride, Etonic must prove that:  (1) the infringed marks are valid and legally protectable; (2) Etonic owns the marks; and (3) In Stride's use of the marks is likely to create confusion concerning the origin of the goods or services.  *See Opticians Ass'n*, 920 F.2d at 192.  Unlike its claim against Kinetic, Etonic does not claim that In Stride improperly labeled its shoes with the Etonic Trademarks.  Its trademark infringement claim potentially applies only to one particular mark, namely, the Sojourn name.

Etonic has not offered evidence that the Sojourn name is a registered trademark.  It must therefore show that the name has acquired a secondary meaning for a finding that the mark is valid and legally protectable.  Secondary meaning is demonstrated where, "in the minds of the

28

public, the primary significance of a product feature or term is to identify the source of the product itself." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991) (quoting *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 152 (3d Cir. 1984)). "Although there are numerous cases determining secondary meaning, there is no consensus on its elements." *Id.* (quoting *Am. Scientific Chem., Inc. v. Am. Hosp. Supply Corp.*, 690 F.2d 791, 792 (9th Cir. 1982)). A non-exclusive list of factors that may be considered includes: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion. *Commerce Nat. Ins. Servs.*, 214 F.3d at 438.

Etonic has provided no evidence that the Sojourn has acquired secondary meaning. By Etonic's own admission, the Sojourn is inconsistent with Etonic's brand image of designing athletic shoes. The record shows that the Etonic Sojourn was only advertised in the 2004 catalog. Etonic has not indicated how much money it has invested in the shoe, nor how much in sales the Etonic Sojourn has generated. Given Etonic's negative view of the shoe, it is unlikely that it invested much to promote the Sojourn. For these reasons, Etonic has failed to demonstrate a probability of success with respect to its trademark infringement claim against In Stride.

### b.    Unfair Competition

Etonic also claims that In Stride engaged in unfair competition in violation of 15 U.S.C. § 1125(a). That section provides that:

> (1)  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —
>
> (A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by

29

another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The Third Circuit Court of Appeals has held that "protection for a product's overall appearance or design should be considered in the analytic framework of trade dress infringement, which is a form of unprivileged imitation, which itself falls under the rubric of unfair competition." *Am. Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1140 n.2 (3d Cir. 1986). Etonic claims that a number of In Stride's shoes are identical to Etonic shoes and that such imitation should be enjoined.

To demonstrate unprivileged imitation, plaintiff must show "that the feature or overall combination of features imitated is non-functional, that it has acquired secondary meaning, and that members of the consuming public are likely to confuse the source of the product bearing the imitating feature or combination with the source of the product bearing the imitated feature or combination." *Id.* at 1141.

Although a court may not enjoin the use of functional features, "if the functional feature or combination is also found to have acquired secondary meaning, the imitator may be required to take reasonable steps to minimize the risk of source confusion." *Id.* As the Third Circuit Court of Appeals has recognized, "virtually every product is a combination of functional and non-functional features and a rule denying protection to any combination of features including a functional one would emasculate the law of trade dress infringement." *Id.* at 1143.

Etonic's unfair competition claim is based on In Stride's Malibu, Venice and Sojourn shoes. Although the In Stride shoes are either similar or identical to certain Etonic shoes, virtually all of the features are functional ones that are not subject to protection.

The In Stride Sojourn is a leather casual walking shoe with a curved and somewhat blunt toe area, cushioning in the area around the ankles, minimal stitching and a heavy-looking bottom

with significant traction.  Seeman Aff. Ex. 53.  Only the extra layer of leather in the area just

beneath the ankle appears to be a non-functional design feature.  *Id.*  With respect to the first

Malibu prototype (which is virtually identical to the Etonic Essence), the shoe has a simple

design, with a rounded toe area, cushioning in the area around the ankles, minimal stitching,

laces and a leather exterior.  Pl. Ex. 8.  Finally, the design features of the In Stride Venice also

appear to be functional.  The shoe has a simple design, involving a rounded toe area, minimal

stitching, a wide velcro strap in lieu of shoelaces and a suede-like exterior.  Pl. Ex. 12.

Moreover, although certain features of In Stride's shoes may be non-functional, Etonic

has failed at this stage to show that these non-functional features have acquired secondary

meaning.  To have secondary meaning means that "in the minds of the public, the primary

significance of a product feature or term [is] to identify the source of the product rather than the

product itself."  *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1440 (3d Cir.

1994).  Etonic has failed to provide evidence that it has invested in advertising these particular

features, that consumers associate these features with Etonic or of the length or exclusivity of its

use of these features.  Etonic has therefore failed its burden with respect to its unfair competition

claim.

### c.    Trademark Dilution

The Federal Trademark Dilution Act provides:

> (1)  The owner of a famous mark shall be entitled, subject to the
> principles of equity and upon such terms as the court deems
> reasonable, to an injunction against another person's commercial
> use in commerce of a mark or trade name, if such use begins after
> the mark has become famous and causes dilution of the distinctive
> quality of the mark, and to obtain such other relief as is provided in
> this subsection.

15 U.S.C. § 1125(c).  "The federal cause of action for trademark dilution grants extra protection

to strong, well-recognized marks even in the absence of a likelihood of consumer confusion—the

classical test for trademark infringement—if the defendant's use diminishes or dilutes the strong

31

identification value associated with the plaintiff's famous mark." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC*, 212 F.3d 157, 163 (3d Cir. 2000).

"To establish a prima facie claim for relief under the federal dilution act, the plaintiff must plead and prove:  (1) [t]he plaintiff is the owner of a mark that qualifies as a 'famous' mark in light of the totality of the eight factors listed in § 1125(c)(1), (2) [t]he defendant is making commercial use in interstate commerce of a mark or trade name, (3) [d]efendant's use began after the plaintiff's mark became famous, and (4) [d]efendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services." *Id.* at 163.  Section 1125(c)(1) provides that a court may consider factors including, but not limited to:

> (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or in the principal register.

15 U.S.C. § 1125(a)(1).

In Stride's Malibu and Venice shoes do not bear Etonic marks, so that the trademark dilution claim applies only to the In Stride Sojourn.  However, Etonic has not offered any evidence to support a claim that the Sojourn name is famous.  The only evidence concerning these factors is that the Etonic Sojourn shoe was advertised in Kinetic's Fall 2004 catalog and continues to be sold from accumulated inventory stocks.  These two facts alone do not make the mark famous.  Etonic therefore also fails to show a probability of success in its trademark dilution claim for the Sojourn.

## IV.    CONCLUSION

For the above reasons, Etonic's motion for preliminary injunction against Kinetic is

GRANTED, and its motion for preliminary injunction against In Stride is DENIED.  An appropriate form of order is filed herewith.


Dated:  December 20, 2005

___s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.
